THE QUADRANT CORPORATION, *Respondent and Cross-appellant,* v. HARRY A. SPAKE *et al., Appellants.*

*Beresford & Booth* and *Robert Baronsky,* for appellants.

*Reed, McClure, Moceri & Thonn, Richard C. Reed,* and *William R. Hickman,* for respondent, cross-appellant.

SWANSON, J.—The Quadrant Corporation, successor in interest to Interlake Realty Co., hereinafter referred to as "Interlake," sued Harry and Charlotte Spake, hereinafter referred to as "Spake," as if he were the sole appellant, and the Volotins and the Ancheses, individually, as well as their joint ventures, partnerships, and corporate enterprises, as indicated in the caption, to recover a $19,125 lease commission and an $8,000 real estate sales commission. The trial court, sitting without a jury, granted judgment only against the defendant Spake in the sum of $19,125 on the lease commission, reduced the $8,000 claim for a real estate sales commission to a judgment for $5,000, and dismissed all claims against the other defendants, the Volotins and the Ancheses. Spake appeals from the $24,125 judgment. Plaintiff Interlake cross-appeals from the trial court's judgment limiting its recovery to Spake and from the reduction of its claimed $8,000 real estate sales commission.

This appeal presents as its primary issue the question of whether or not the breach by the lessor in a lease commission agreement excuses performance of a condition precedent to fulfillment of the agreement—availability of construction financing—and permits the broker to recover his lease commission. The trial court determined that it did, so that nonperformance of a condition precedent was not a defense and permitted the broker to recover.

To explain the transaction and furnish a background for discussion of the applicable legal principles, we set forth the following pertinent facts as found by the trial court. On or about August 20, 1960, the defendant Spake obtained a long-term lease to certain property located in Lynnwood, Washington, and subsequently purchased a fee interest in certain adjoining property upon which he desired to construct a shopping center. After several months of negotiation, Spake entered into an agreement with Interlake on October 28, 1965, which provided that if Interlake

renegotiated Spake's existing lease with Associated Grocers to increase the rental over the agreed upon $1.50 per square foot, Interlake would be entitled to a commission of one-half of such increase. This same agreement also provided: "the fulfillment of this Agreement is dependent upon financing necessary to provide funds to SPAKE for construction of the improvements to be leased; . . ."

Thereafter, Interlake succeeded in renegotiating Spake's lease with Associated Grocers and obtained a lease dated November 17, 1965, which provided for a fixed minimum rental of $1.65 per square foot per year for 17,000 square feet over a 15-year term. This rental increase computed over the 15-year period of the lease amounted to $38,250. Interlake claimed one-half of that sum, $19,125, as its commission.

The October 28, 1965, agreement between Spake and Interlake also provided in paragraph 2: "REALTOR shall seek tenants of good financial standing and shall present proposed leases to SPAKE for approval . . ." The trial court specifically found that although Interlake did communicate with various other prospective tenants, it did not at any time present to the defendant Spake any lease agreement signed by any prospective tenant or any firm commitment to lease any portion of the proposed shopping premises. The court found, however, that Interlake did make available to Spake certain architectural services and other services for construction of the contemplated shopping center, and found that payment for such assistance was contingent upon actual construction.

In November, 1965, Interlake contacted Securities Mortgage Co. in an attempt to obtain a commitment from an institutional lender for long-term construction financing for the shopping center. After investigation with all of the institutional lenders interested in shopping center financing, Securities Mortgage Co. located only one institutional lender, Northwestern National Life Insurance Co., that was interested in entertaining a loan application. All of the other institutional lenders informed Securities Mortgage

Co. that they would not entertain a loan application because the Spake property included unsubordinated leased land. On March 24, 1966, Securities Mortgage Co. furnished defendant Spake with two form applications for a loan, one to Securities, and the other to Northwestern, for financing totaling $325,000 in connection with a plan to construct the shopping center with building space of about 30,000 square feet. Spake refused to sign either of the loan applications submitted to him although Interlake urged him to do so and told him the proposed financing represented a sound program. From these facts, the trial court concluded:

[1]

The program for a shopping center development, as presented to defendant Spake up to the time he refused to sign the presented loan applications, met the conditions as to economic soundness contained in their agreement of October 28, 1965. When the defendant Harry Spake refused to sign the loan applications which were sent to him by Securities Mortgage Company on March 24, 1966, as he was urged to do by Interlake Realty Co., *he* acted in bad faith and thereby *breached his agreement with Interlake Realty Co.*

(Italics ours.) Conclusion of law No. 1.

Spake assigns error to this conclusion of law and argues that it is not supported by the trial court's own findings of fact. Because of our disposition of this appeal, it is not necessary to determine that question. Appellant Spake also assigns error to conclusion of law No. 2 which presents that which we have indicated is the primary issue in this case. It states:

[2]

The fact that *construction financing probably was not available to Spake,* due to the refusal by Joseph Vaughan to agree to subordinate his fee interest to a lien for construction financing, *is not a matter which validly can be raised in defense* to the plaintiff's claim for a commission in connection with the Associated Grocers lease. The plaintiff need only show that Spake refused to sign and submit the loan application requested from him. The

plaintiff should have judgment against Spake for the sum of $19,125.00.

(Italics ours.)

The argument advanced by Interlake in support of the trial court's conclusion of law appears in broad terms to be that it is entitled to a commission for renegotiation of the Associated Grocers lease, regardless of whether or not Spake could ever secure financing or otherwise go ahead with his shopping center construction project. At the very least, Interlake contends that the trial court correctly determined that Spake's refusal to sign the loan applications constituted a breach of the commission agreement such that the availability of construction financing, upon which the agreement depended for fulfillment according to its terms, is irrelevant in determining whether or not Interlake is entitled to its broker's fee.

A similar problem was presented in *White & Bollard, Inc. v. Goodenow,* 58 Wn.2d 180, 361 P.2d 571 (1961), where a real estate broker sued to recover a claimed commission. The broker had procured a purchaser for the seller, and an earnest money receipt and agreement was entered into which was conditioned on the purchaser's obtaining satisfactory financing within 90 days. Before the expiration of the 90 days, the seller sold the property to someone else. The court concluded that even though the prospective purchaser had not secured financing within the 90-day period, he was excused from so doing because of the seller's breach; however, the court also held that the prospective purchaser could not recover damages, and the broker could not obtain his fee, in the absence of a showing that the condition as to financing could have been met. The court explained its reasoning in this language:

Applying the rule to the facts, we find that the respondent manifested that she would not perform her agreement when she sold her property to others. She did not retract this manifestation, and the performance of the condition imposed on the appellant was excused; that is, the purchaser was not required to secure satisfactory

financing for a building which he could not erect. However, he could not maintain a suit for damages against the respondent without showing that, had she not disposed of the property, he could and would have secured the financing. *The appellant likewise cannot maintain its suit for the broker's fee without showing that the condition could and would have been met.*[1]

(Italics ours.) *White & Bollard, Inc.,* 58 Wn.2d at 188. The rationale of *White & Bollard, Inc.* was followed in *Jenson v. Richens,* 74 Wn.2d 41, 442 P.2d 636 (1968), when the court stated at page 45:

> Where the performance of one promise is a condition precedent to a right of action on the promise of another, the first promissor must plead and prove the performance or tender of performance of his promise in order to maintain an action for the breach of the other's promise. [Citations omitted.] This is but a natural corollary to the rule that one contracting party is not required by law to do a useless act and tender performance where the other contracting party cannot or will not perform his part of the agreement.

Although the case is not cited in its brief, Interlake's argument appears to be based upon the holding in *Dryden v. Vincent D. Miller, Inc.,* 56 Wn.2d 657, 354 P.2d 900 (1960), where the court stated at page 660:

> We have held that, when a real-estate broker has procured a prospective purchaser who is accepted by the seller, and the seller promises to pay the broker a certain commission for services rendered, the broker has earned the commission, and the promise to pay it may be enforced.

This general rule relied upon by Interlake has no application to the case at bar, because we are dealing herein with a qualified, rather than an unqualified, promise to pay. In this connection, the following language from *White & Bol-*

---

[1]It should be noted that *White & Bollard, Inc.* was before the Supreme Court on an appeal from an order granting a challenge to the sufficiency of the complaint resulting in a dismissal. Therefore, the court had no findings of fact to consider, only the sufficiency of the complaint.

*lard, Inc.* was cited in *Clarkson v. Wirth,* 4 Wn. App. 401, 481 P.2d 920 (1971), with regard to the quoted rule in *Dryden,* at page 405:

> Implicit in this rule is the requirement that the purchaser be willing to purchase, and that in contracting with the seller, he has agreed to purchase the property. Here we do not have such an unqualified promise, but rather a conditional promise, and the respondent's right to collect his fee was also made conditional upon the purchaser's obtaining satisfactory financing. *The securing of such financing was a condition precedent. Until it had occurred, the respondent was not obliged to sell, and the purchaser was not obliged to buy the property, and the appellant was not entitled to its fee.*

In *Clarkson,* the earnest money agreement provided, 4 Wn. App. at 402:

> This offer to purchase is made subject to purchasers disposing of certain properties upon which deals are now pending and said deals to be closed prior to the closing of this deal.

The court concluded that the broker was not entitled to any commission because the offer to purchase was made subject to the purchaser's disposing of certain properties which condition was not met. In that case, as in the case at bar, the broker contended that he obtained a purchaser whose offer was accepted, and therefore the purchaser's failure to obtain adequate financing, which resulted in relieving the purchaser of his obligation to buy, did not affect the broker's commission. We determined in *Clarkson* that the promise to buy was conditional and the broker was entitled to his commission only in the event the purchaser obtained adequate financing, and because such financing was not available the broker was not entitled to his fee.

We are persuaded beyond peradventure by the authorities cited that Interlake cannot maintain a suit for its broker's fee without showing that the condition in the October 28, 1965, agreement—availability of construction financing—either was or could have been complied with.

In the case at bar, the trial court found as a fact that "[i]n all probability, the loan committee of Northwestern National Life Insurance Company would have rejected the loan application had it been submitted because of the unsubordinated leased land in the proposed site." Finding of fact No. 18, in part. Further, as discussed later in this opinion, the trial court's findings indicate that substantially the same loan applications were subsequently processed on behalf of one Norman Volotin and were rejected for the reason that the lender would not loan on leased land without the fee owner's subordination. These findings of fact are based upon substantial evidence and therefore must be accepted as verities.

In view of the trial court's determination that construction financing probably was not available, even if the loan applications had been submitted by Spake, we conclude that the condition precedent upon which performance of the October 28, 1965, commission agreement depended was not and could not have been met. Consequently, we hold that Interlake is not entitled to its lease commission in the amount of $19,125 and the trial court's judgment awarding such commission must be reversed.

Appellant Spake's second major contention is that the trial court erred in awarding Interlake a $5,000 real estate commission on the theory that Interlake was the *procuring cause* of the eventual sale by Spake to Volotin and Anches. This claim of error is specifically directed to conclusion of law No. 3 which states in part as follows:

[3]
As to the eventual sale by defendants Spake to defendants Volotin and Anches, Interlake Realty Co. . . . *did sufficient acts to be deemed the procuring cause* of the particular sale. A land sale commission from Spake therefore is due and owing.

(Italics ours.) Spake contends that the trial court had insubstantial evidence upon which to find and conclude that Interlake was a "procuring cause" of the sale and consequently such a conclusion cannot be sustained.

The trial court's findings which are not challenged by Spake indicate the following events took place after his refusal to sign the loan application. Early in May, 1966, with Spake's consent, Interlake contacted Norman Volotin who was acting in behalf of the Volotin Investment Co., a partnership composed of himself and his father, and negotiated an earnest money agreement signed by Spake and Volotin on June 9, 1966. By the terms of this agreement, the Volotins agreed to buy Spake's interest for $80,000 and agreed to pay any commission owing Interlake because of the previously discussed rent increase obtained on Spake's lease with Associated Grocers. The agreement also provided for an $8,000 commission, amounting to 10 percent of the sale. However, the entire agreement was conditioned upon Volotin's getting satisfactory financing for a shopping center.

As indicated previously herein, Volotin submitted the loan applications, which Spake had refused to sign, and they were rejected because of the continued refusal of Spake's lessor to subordinate his fee interest to a mortgagor's lien interest. As permitted by the agreement, Volotin then timely advised Interlake that the financing condition was not satisfied and the transaction was at an end.

The eventual land sale which the trial court concluded entitled Interlake to a commission, as distinguished from Interlake's claimed lease commission previously discussed, is described in findings of fact Nos. 22, 23, and 24, which state:

[22]

In early December, 1966, the defendant Harry Spake contacted the defendant Norman Volotin and offered to sell his interest in the site for $50,000.00 cash, with Norman Volotin to pay all closing costs and to hold Spake harmless from any commissions which might be due to Interlake Realty Co. During the months preceding December, 1966, Interlake Realty Co. made known to Spake its claim for a commission in connection with the Associated Grocers lease, which claim Spake rejected. The defendants Volotin did not desire to purchase the prop-

erty for cash themselves and, therefore, they contacted the defendants Anches who agreed to enter into a joint venture with the defendants Volotin to purchase and develop the property. The defendants Anches had access to cash with which to purchase the property. On December 21, 1966, the defendant Harry Spake, at a meeting with the defendants Volotin and Anches, entered into an agreement to sell his interests to them essentially for the price and on the terms mentioned above.

[23]

The interest of defendants Spake was transferred to defendants Volotin and Anches for a total price of $50,000.00, and they did agree to hold the Spakes harmless from any commissions due Interlake Realty Co. Defendants Volotin acquired a 60% interest in the property acquired from the Spakes and the defendants Anches acquired a 40% interest in the property acquired from the Spakes.

[24]

Interlake Realty Co. never had any contact or knowledge of the defendants Anches and the sale from the defendants Spake to the defendants Volotin and Anches was without the knowledge of Interlake Realty Co.

In addition to these specifically described factual determinations, the trial court gave reasons for its conclusions that Interlake's effort was the procuring cause of the sale in conclusion of law No. 3 as follows:

[3]

As to the eventual sale by defendants Spake to defendants Volotin and Anches, Interlake Realty Co., having been involved with Spake since the beginning of 1965, having brought Spake to Volotin at the beginning of May, 1966, and having negotiated the Earnest Money Receipt and Agreement between Spake and Volotin on June 29, 1966, did sufficient acts to be deemed the procuring cause of the particular sale.

Conclusion of law No. 3, in part.

We are satisfied from a careful review of the record that the factual determinations of the trial court here in question are supported by substantial evidence. The only question remaining for our consideration is whether or not

these facts support the determination, called a conclusion of law, that Interlake was the procuring cause of the sale. In this connection, we note that it appears that our state Supreme Court has treated the determination of what constitutes "procuring cause" as a finding of ultimate fact, rather than a conclusion of law. This view is indicated by what was said in *Feeley v. Mullikin*, 44 Wn.2d 680, 685, 269 P.2d 828 (1954):

> Had the trial court found as an ultimate fact that Feeley was the procuring cause of the sale, we could affirm the judgment based upon such finding without more ado; but the trial court made no such specific finding, . . .

See *Chamness v. Marquis*, 62 Wn.2d 509, 383 P.2d 886 (1963).

In the case at bar the trial court determined that Interlake was the procuring cause of the sale but labeled its determination a conclusion of law, although its true identity is not established by its label. We regard it as a finding of ultimate fact, or a mixed question of fact and law and treat it as such. *Kane v. Klos*, 50 Wn.2d 778, 314 P.2d 672 (1957). What is of primary significance is whether or not the facts as found by the trial court and the evidence support such a determination, regardless of how it is labeled. Appellant Spake argues that Interlake failed in its burden to show that it in fact was the procuring cause of the sale. Spake points to finding of fact No. 25 in support of this argument. It states:

[25]

> The defendants Volotin and Anches did develop and construct a shopping center on the property acquired from Spake. Funds for interim, short-term construction were obtained on an unusual, unconventional basis from the Bank of California, which was principally due to the close business relationship said bank had with the defendants Anches.

From this finding, Spake argues that the financing secured by Anches was the significant and prime reason the sale was eventually consummated; and without it, the same

would not have been effected. Therefore, he contends that Interlake's efforts, having ceased several months prior to Spake's December, 1966, contract with Volotin, could not have been the procuring cause of the sale.

While it is true the findings show that the financing secured by Anches contributed significantly to the eventual sale, we cannot say that Interlake's efforts in working with Spake since 1965, introducing Spake to Volotin in May, 1966, and negotiating the earnest money receipt and agreement in June, 1966, did not amount to bringing about the eventual sale. It would be only conjecture for us to say that the fact that construction funds were obtained on an unconventional basis due to Anches' close relationship with the lending institution was the sole, decisive factor. It may have been a significant factor, but we cannot say it superseded the combined acts of Interlake. Even though the terms of the sale eventually consummated differed from those contained in the June 29, 1966, earnest money agreement, primarily in that the sale involved the joinder of other purchasers who made available a special source of financing, such factors, though significant, do not nullify the trial court's finding of procuring cause. As stated in *Feeley v. Mullikin, supra* at 683:

> When a broker is employed to procure a purchaser on certain terms and he procures a purchaser to whom a sale is eventually made, he is entitled to a commission *irrespective of who makes the sale or the terms thereof, if he was the procuring cause of the sale.* [Citations omitted.]
>
> The corollary follows that the fact that a broker produces a purchaser to whom the sale is eventually made does not entitle him to a commission *if he was not the procuring cause of the sale.*

We conclude that the evidence and the findings are sufficient to support the trial court's finding of ultimate fact which appears in the record as the previously quoted portion of conclusion of law No. 3, namely, that Interlake's effort was the procuring cause of the eventual sale, which entitled Interlake to a commission.

We turn now to Interlake's cross-appeal. First, Interlake argues that the land commission award for the eventual sale by Spake to Volotin-Anches ought to be $8,000 rather than $5,000 as awarded by the trial court. Interlake bases this contention on the fact that the earnest money agreement of June 29, 1966, from which the rate of commission is determined, recited no percentage figure for the determination of the commission, but stated only that the commission would be the sum of $8,000. However, the trial court's finding on this question, which is supported by substantial evidence, is essentially that the June 29th agreement was based on a 10 percent commission which, of course, totals $8,000 because the proposed sale price in such agreement was $80,000. Therefore, the trial court concluded that the same percentage rate ought to be applied to the eventual sale which totaled only $50,000, resulting in the commission of $5,000 awarded in the judgment. The trial court correctly computed Interlake's land sale commission.

Second, Interlake urges that Volotin and Anches ought to be liable jointly with Spake for the land sale commission and also for the claimed $19,125 lease commission. We disagree.

As to the Volotins, Interlake suggests that their liability for both an $8,000 land sale commission and a $19,125 lease commission is established by a letter dated May 2, 1966, written by Volotin to Interlake, if it is considered in the context of the written terms of the eventual sale by Spake to Volotin. This contention must fail because the only reasonable interpretation of the trial court's findings indicates that the May 2nd letter was superseded by the June 29th contingent earnest money agreement which, as we have discussed, became null and void by its own terms when Volotin was unable to obtain financing.

Interlake next argues that Volotin got the benefit of the Associated Grocers lease as a result of the eventual purchase of the property from Spake and consequently is liable in the sum of $19,125 as provided for in the June 29th

agreement. This argument also must fail, because the court found:

[26]
Associated Grocers negotiated and signed a *new* lease in October, 1967, with defendants Volotin and Anches, providing for $1.90 per square foot annual minimum rental and 22,000 square feet of tenant space.

(Italics ours.) Finding of fact No. 26, in part. The finding that Associated Grocers and Volotin-Anches negotiated a *new* lease is based upon evidence that prior to the sale by Spake to Volotin, Spake and Associated Grocers mutually agreed to cancel and terminate the lease which had been renegotiated by Interlake. Therefore, such prior lease was not involved in the sale of the property by Spake to Volotin-Anches. Significantly, the lease ultimately entered into by Associated Grocers and Volotin-Anches provided for a rental computed on a much greater sum per square foot and for the leasing of a larger area than had been provided in the prior lease reinstated by Interlake. In addition, the trial court specifically found:

[26]
Associated Grocers would not have signed such lease unless and until defendants Volotin and Anches had a firm commitment from Pay'n Save Corporation to be a major tenant in the shopping center, which firm commitment was obtained. Interlake Realty Co. played no role in the negotiation of the eventual lease between Associated Grocers and defendants Volotin and Anches and said defendants did not utilize any construction or architectural services previously performed/or offered by Interlake Realty Co. or its affiliated companies.

Finding of fact No. 26, in part.

The next argument advanced by Interlake, in its effort to persuade us that the judgment for the lease commission ought to have been entered against Volotin as well as Spake, is based upon the so-called "hold harmless agreement" entered into between Spake and Volotin as part of their land sale agreement. On this subject the trial court made this conclusion:

[4]

Although the defendants Volotin and Anches, at the time of purchase from the defendants Spake, agreed to hold the Spakes harmless from any commissions, such an agreement can only be availed of by defendants Spake who have not made any claim in this action. The agreement is not a third party beneficiary contract . . .

Conclusion of law No. 4, in part. We agree with this analysis. See *American Pipe & Constr. Co. v. Harbor Constr. Co.,* 51 Wn.2d 258, 317 P.2d 521 (1957); *McDonald Constr. Co. v. Murray,* 5 Wn. App. 68, 485 P.2d 626 (1971). The trial court correctly concluded that the "hold harmless agreement" should not be interpreted to mean that Volotin and Anches thereby assumed a direct obligation to Interlake. It was purely a contingent liability arrangement between the parties, and neither party assumed an existing direct obligation to Interlake. The trial court properly excluded Volotin from liability to Interlake for the lease commission. Further, we note that the only theory Interlake advances for fixing liability upon the Ancheses is that they were partners of Volotin. In view of our determination that Volotin is not liable to Interlake, no basis remains for extending such liability to Anches.

Finally, respondent Interlake assigns error to various findings of fact made by the trial court, as well as to the trial court's refusal to sign and enter 21 proposed findings of fact which Interlake submitted. None of these assignments of error merit separate discussion, and such discussion would unreasonably extend this opinion. We have read and reviewed the record carefully, and despite the presence of some evidence to support many of the proposed findings which were rejected by the trial court, it was not error to refuse such findings. See *Segall v. Ben's Truck Parts, Inc.,* 5 Wn. App. 482, 488 P.2d 790 (1971).

Interlake's cross-appeal, however, does raise one additional question, namely, the matter of prejudgment interest. Interlake claims that it sued for a liquidated amount, and therefore it is entitled to interest from the date of the

obligation, rather than from the date of the judgment. We agree with Interlake as to this contention. *See Prier v. Refrigeration Eng'r Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968); *Erickson Paving Co. v. Yardley Drilling Co.*, 7 Wn. App. 681, 502 P.2d 334 (1972). The evidence presented as to the real estate commission due in connection with the eventual sale involves a liquidated claim because such evidence makes it possible to compute the amount owing with exactness without reliance on opinion or discretion.

We reverse the trial court's judgment of $19,125 for the lease commission against appellant Spake, and affirm the trial court's $5,000 judgment for the land sales commission against appellant Spake, with the direction that the latter be modified to reflect interest from the date of the sale between Spake and Volotin-Anches, pursuant to law.

FARRIS, A.C.J., and CALLOW, J., concur.

Petition for rehearing denied March 19, 1973.

Review denied by Supreme Court May 23, 1973.