[No. 5186–1. Division One. June 5, 1978.]

PETER L. REDBURN, INC., *Respondent,* v. ALASKA AIRLINES, INC., *Appellant.*

316

*Dennis E. Olson,* for appellant.

*Steinberg & Steinberg* and *Quentin Steinberg,* for respondent.

RINGOLD, J.—The plaintiff, Peter L. Redburn, Inc., d/b/a Roth Young Personnel Service of Seattle (Roth Young) brought an action for money due against defendant Alaska Airlines, Inc. (the airline). The trial court found that the airline owed Roth Young $2,881.50 plus interest in the amount of $201.03 for services rendered by Roth Young, and entered a judgment to that effect. Defendant appeals.

Alaska Airlines owns and operates the Alyeska Ski Resort near Anchorage, Alaska, and in late March 1975, placed an advertisement in the Seattle Times seeking applicants for the position of administrative director of the resort. Frank J. DeMartini is an account executive for Roth Young, a firm which specializes in placement of executive and management personnel. On the basis of the advertisement he sent a letter to the post office box listed therein. In the letter, DeMartini indicated that Roth Young knew of a good candidate for the position advertised.

A few days later, DeMartini received a call from Douglas L. Versteeg, the airline's director of property accounting. In the ensuing discussion, the two men discussed the possibility of Roth Young's supplying the airline with job applicants. The parties came to an agreement that the airline would pay Roth Young's placement fee if Roth Young disclosed an applicant to the airline and that applicant was ultimately hired. There was no specific discussion as to whether mere disclosure of a suitable applicant by Roth Young would entitle it to a fee, or whether Roth Young's efforts must be the procuring cause of the hiring.

On April 2, 1975, DeMartini sent Versteeg a letter confirming the fee agreement and stating: "The fee for our services is earned if a person is hired within one year from the date we refer him, directly or indirectly to your firm." DeMartini enclosed several resumés with the letter, one of which was the resumé of Michael Mooney.

Several weeks later, DeMartini again contacted the airline and was told that Ed Schnebele, the airlines personnel manager, was now in charge of finding an applicant to fill the position at the resort. Upon learning this DeMartini set up a meeting with Schnebele for May 15, 1975. DeMartini brought several resumés to the meeting including another copy of Mooney's resumé. After looking at the resumés, Schnebele told DeMartini that he had interviewed Mooney earlier that day. He then pulled another of Mooney's resumés stamped with the name of Roth Young Personnel Service of Seattle, from his desk. Schnebele had read the resumé after it was forwarded to him by Versteeg.

Bruce Kennedy, a senior vice–president with the airline, had met Mooney socially at some time in 1975. Kennedy suggested that Dennis Osterdock, manager of the airline's Fairbanks properties, consider Mooney for a job at the Golden Nugget Hotel in Fairbanks. Osterdock then contacted Schnebele concerning the possibility of hiring Mooney for the Fairbanks job.

In June 1975, after a subsequent interview with Versteeg, the airline hired Mooney for the Alyeska Ski Resort position at an annual salary of $16,950. Roth Young claimed its fee and the airline refused to pay.

The only factual finding disputed by the airline is finding of fact No. 4, in which the court found that the airline agreed to pay Roth Young a fee if Roth Young disclosed an applicant who was acceptable to the airline and was subsequently hired by the airline. The airline contends that the agreement required a causal relationship between the disclosure and the hiring, and no such causal relationship existed because Mr. Mooney was hired solely through the independent efforts of Mr. Kennedy.

DeMartini and Versteeg gave conflicting testimony as to the terms of the parties' agreement. The fact that the evidence may be subject to different interpretations does not authorize this court to substitute its findings for those of the trial court. *Lamm v. McTighe,* 72 Wn.2d 587, 591, 434 P.2d 565 (1967). If the trial court's findings are supported by substantial evidence, they will not be disturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). *Brauhn v. Brauhn,* 10 Wn. App. 592, 518 P.2d 1089 (1974).

After reviewing the record, we find substantial evidence to support the trial court's finding of fact No. 4. The testimony of DeMartini, and the letter sent by him to Versteeg confirming the agreement between the parties, support the trial court's finding that the parties reached an agreement that the airline would pay Roth Young's fee if Roth Young disclosed a candidate who was subsequently hired by the airline. Although Versteeg testified that the agreement required a causal relationship between the disclosure and the hiring, the trial court, as trier of fact, need not have believed this testimony and was entitled to give credence to plaintiff's evidence. *Nissen v. Obde,* 55 Wn.2d 527, 348 P.2d 421 (1960).

Alaska Airlines argues further that regardless of the court's findings, as a matter of law, an employment agency's

actions must be the procuring cause of the hiring of a job applicant in order for the agency to be entitled to a fee.

Because of the absence of a body of law relating to employment agency contracts, such as the one in this case, we look to the Washington law relating to brokers' contracts for assistance in reaching our decision. The Washington courts have generally held that: "When a broker is employed to procure a purchaser on certain terms and he procures a purchaser to whom a sale is eventually made, he is entitled to a commission *irrespective of who makes the sale* . . ." *Feeley v. Mullikin,* 44 Wn.2d 680, 683, 269 P.2d 828 (1954). *Accord, Chamness v. Marquis,* 62 Wn.2d 509, 513, 383 P.2d 886 (1963), *Quadrant Corp. v. Spake,* 8 Wn. App. 162, 173, 504 P.2d 1162 (1973).

In *Client's Serv., Inc. v. Pupo,* 71 Wn.2d 610, 615, 430 P.2d 552 (1967), the court noted a limitation on the general rule and held that the question of whether the broker must have been the procuring cause of the sale in order to be entitled to a commission depends on the language used in the listing agreement. Although we recognize there are differences between real estate brokers and employment agencies, we believe that this reasoning is most persuasive in the context of an employment agency contract.

The trial court determined that the parties' contract did not require Roth Young be the procuring cause of an applicant's employment by the airline. There was no evidence presented that "procuring cause" terms are implied by custom in the employment agency business. This was an arm's-length transaction between two corporate entities which contemplated performance by disclosure of a candidate by Roth Young and the subsequent hiring of that candidate by the airline. The evidence is undisputed that the contract, thus defined, was performed. The trial court properly gave effect to the agreement of the parties and refused to create a contract which the parties did not make themselves. *Farmer's Ins. Co. v. Miller,* 87 Wn.2d 70, 73, 549 P.2d 9 (1976).

Alaska Airlines relies on the case of *Lloyd Hammerstad, Inc. v. Saunders,* 6 Wn. App. 633, 636, 495 P.2d 349, 51 A.L.R.3d 1145 (1972) for the proposition that, for Roth Young to receive its fee, there must have been some "minimal causal relationship" between its activities and the hiring of Mr. Mooney. The rationale of *Hammerstad* is inapplicable here. *Hammerstad* concerned an exclusive listing agreement for 1 month for the sale of real property. An extension provision upon which the action by the broker for commission was based obligated the seller to pay:

> [I]f: . . . (3) said property, or any part thereof, is sold or exchanged within twelve (12) months after the expiration hereof to any person to whom you, or any member or salesman or "Multiple", or any person authorized by such member or salesman have previously offered it, or with whom you have negotiated or who has learned through you or your advertisements, directly or indirectly, that the property was for sale.

*Lloyd Hammerstad, Inc. v. Saunders, supra* at 634.

The court noted that the underlying purpose of extension provisions in real estate brokerage listing agreements is to protect the agent from an owner who might postpone acceptance until after the expiration of the exclusive listing agreement. The court went on to state: "Implicit in this underlying purpose is the fact that there must be some minimal causal relationship between the activities of the broker during the listing period and the ultimate sale." *Lloyd Hammerstad, Inc.,* at 636.

A causal relationship is not necessarily implicit in an employment agency agreement such as the one in this case. In a real estate sales context, such an implication is fair because the requirement of a minimal causal relationship limits the broker's absolute right to a commission during the extension period. In a real estate situation, the broker need only present a ready, willing and able buyer to be entitled to his commission. *Burt v. Heikkala,* 44 Wn.2d 52, 55, 265 P.2d 280 (1954); *Record Realty, Inc. v. Hull,* 15 Wn.

App. 826, 828, 552 P.2d 191 (1976). If he finds a buyer during the term of the listing agreement, he cannot be prevented by the seller from earning his commission. Since he may earn his commission after the listing period, the requirement that there be a minimal causal relationship between the broker's activities during the listing period and the ultimate sale has validity. Here, however, Alaska Airlines retained control over the transaction *at all times* and could avoid payment of the agency's fee by not hiring the applicant. Alaska Airlines did not commit itself to pay any fee no matter how prodigious the efforts of Roth Young may have been to secure a suitable employee. The parties' contract did not require a causal relationship between the disclosure and hiring of an applicant.

Judgment affirmed.

FARRIS, C.J., and WILLIAMS, J., concur.