**Roger WILCOX and Technico-Op, Inc., Plaintiffs,**

v.

**ST. CROIX LABOR UNION MUTUAL HOMES, INC., Defendant.**

Civ. No. 91–1979.

District Court, Virgin Islands, D. St. Croix.

June 28, 1983.

Kenneth Lindquist, Christiansted, St. Croix, V.I., for plaintiffs.

Russell B. Johnson, Christiansted, St. Croix, V.I., for defendant.

## OPINION

WEBER, District Judge.

Historically in this country private aid to the underprivileged has been a philanthropic activity performed primarily out of charitable motives. In the past generation, however, the nature of private aid to the poor has changed dramatically. While private charitable organizations continue to do important work assisting the disadvantaged in our society, they have now been joined by a host of companies which provide services to the poor on a strictly commercial basis.

The development of this business is directly related to the more active role which government has taken in providing for the less fortunate in society. Government assistance to the poor has taken two basic forms. First, the state through a series of programs provides direct aid to the disadvantaged. In addition, however, the government aids the underprivileged by providing financial incentives to privately operated programs designed to assist the poor. These incentives, in the form of subsidies and low interest loans, have spurred the development of a growing industry in this country. Private business concerns, in cooperation with government agencies, now provide the poor with a wide range of goods and services. In short, poverty, and aid to the poor, has now become a major business in this country.

This lawsuit is one product of this burgeoning business. The plaintiffs in this ac-

tion, Roger Wilcox and Technico-op, Inc. were the managing agents of a federally subsidized low income cooperative housing project called St. Croix Labor Union Mutual Homes. In March of 1977 the plaintiffs were discharged by the Department of Housing and Urban Development from their position as managing agents at this project. This discharge was occasioned by the Department's conclusion that the plaintiffs had mismanaged the St. Croix project.

Two years later, on April 30, 1979, this action was filed in the United States District Court of the Virgin Islands, St. Croix Division. In this action the plaintiffs are suing the cooperative to recover management fees allegedly due them and to compensate them for certain expenses incurred as agents for the cooperative.[1] The defendant has denied any liability to the plaintiffs for these fees and has filed a counterclaim for damages to the cooperative arising out of the plaintiffs' allegedly negligent management of the project.

This matter is now before the court for the purpose of making findings of fact and conclusions of law following a non-jury trial begun April 11, 1982. At this trial both parties were given an opportunity to present evidence in the form of testimony and documentary exhibits. The court also entertained the arguments of counsel at the conclusion of all the testimony. Following this trial we ordered the parties to submit proposed findings and post-trial briefs. These have been received and reviewed by the court. Accordingly this matter is now ripe for our resolution.

## 1. FACTS

The testimony, as presented at trial, revealed the following facts: The plaintiffs, Roger Wilcox and Technico-op, Inc., are in the business of providing management services to a large number of low and moderate income housing projects throughout the United States. Presently Wilcox is a member of the Board of Directors of Technico-op and serves as a consultant to that firm. During much of the period covered by this lawsuit Wilcox acted as the President of Technico-op.

In the latter part of the 1960's the plaintiffs were involved in the development of a federally subsidized housing project in San Juan, Puerto Rico. While working at this project Wilcox was approached by representatives of the St. Croix Labor Union. These individuals were interested in developing a similar project on the Island of St. Croix. After discussions with these individuals Wilcox agreed to promote and manage a low income cooperative housing development on St. Croix.

Under the arrangement struck by Wilcox, Technico-op would organize a separate housing cooperative, in this case St. Croix Labor Union Mutual Homes, Inc. Technico-op would then prepare a cooperative "package", consisting of land, building plans and financing, through some third party developer. The cooperative would then buy this package from the developer. Once the package was sold to the cooperative and developed, Technico-op and Wilcox were responsible for the marketing and management of the completed housing development.

The package which Technico-op prepared for St. Croix Labor Union Mutual Homes, Inc. contemplated the development of a housing project on the western end of St. Croix. The project was to be located approximately mid-way between Frederiksted, one of the principal towns on the island, and the Hess Oil Refinery, St. Croix's largest single employer. The housing development consisted primarily of three story garden apartments, which were to be developed in two sections, called phases. Phase 1 consisted of 189 separate living units. Construction of Phase 1 was completed in 1971.

---

1. The plaintiffs' complaint as originally framed also made allegations against the Department of Housing and Urban Development. By prior opinion and order the claims against HUD were dismissed. Therefore, this action is proceeding against the defendant cooperative alone.

Phase 2 involved the construction of an additional 108 units. Work on Phase 2 was completed in 1977. Both phases of the project were built from the same basic design and physically these two phases were indistinguishable from one another.

As originally structured this cooperative was to receive financial assistance from the government in three ways. First, the project received federal assistance in the form of a special low interest mortgage. In addition, the project and its residents benefited from two types of rental subsidy.

The first type of subsidy was referred to as rental assistance. This was a limited form of subsidy. Under this program a resident rental payment obligation was calculated on the basis of either 40% of his base rent, or 30% of his income. A tenant subsidized by rental assistance was required to pay the greater of these two amounts by himself. The balance of the tenant's rent was then paid by the Department of Housing and Urban Development.

The second type of rent subsidy available to residents of this project was Section 8 assistance. Under the Section 8 program a tenant simply paid 25% of his income to the cooperative as rent. The balance of the rent owed was then, once again, provided by the Department of Housing and Urban Development.

Both of these rental assistance programs were managed by the Department of Housing and Urban Development. In order to qualify for this assistance residents had to meet certain eligibility requirements, which differed from program to program, and be certified by the Department. The cooperative and its managing agent were given considerable responsibility for insuring that residents complied with these eligibility requirements.

Wilcox and Technico-op began management of this development in 1970, prior to the completion of Phase 1. The relationship between Technico-op and St. Croix Labor Union Mutual Homes, Inc. was set forth in two successive project management agreements, signed in 1970 and 1975. Under these agreements the plaintiffs, as managing agents for St. Croix Labor Union Mutual Homes, Inc., were given wide-ranging responsibility for the operation of this cooperative.

Generally the plaintiffs were obliged to "operate and maintain the project according to the highest standards achievable consistent with the overall plan of the owner and the interests of the consenting parties." (Paragraph 11(B) 1975 Agreement). In practice this meant that the plaintiffs, as managing agents, were required to cooperate fully with both the Department of Housing and Urban Development and with the project's owners. (Paragraph 4 and 5, 1975 Agreement). The managing agent was also responsible for marketing the project and was obliged to use his best efforts to cause all available memberships in the cooperative to be sold. (Paragraph 7 and 9(c) 1975 Agreement).

Once units were marketed the agent had a duty to operate and maintain the development. Thus the agent was required to maintain businesslike relations with all cooperative members. (Paragraph 9B 1975 Agreement). Furthermore, it was the agent's duty to collect all monthly charges due from the members of the project and to arrange for utility service to the development. (Paragraph 10A and 13, 1975 Agreement). The agent also had to allocate the cost of these utilities in an equitable manner to the individual residents of the cooperative.

In addition the managing agent was responsible for the maintenance and repair of the project. (Paragraph 12, 1975 Agreement). This obligation extended not only to the buildings themselves but also to the accompanying grounds. The management agreement placed particular emphasis on preventive maintenance of the project, dictating that this area should receive special attention by the managing agent.

Under these agreements the managing agent was also required to make timely

payment of all the obligations of the cooperative. (Paragraph 15, 1975 Agreement). Thus it was the agent's duty to insure that employee compensation, taxes, operating expenses and mortgage payments were paid in a prompt manner.

Because the agent was generally responsible for the financial affairs of the cooperative, the management agreements provided that it should maintain a comprehensive system of accounts and records for the project. (Paragraph 17A, 1975 Agreement). In addition the agent was to prepare periodic and annual budgets and financial reports for the development. (Paragraph 16 and 17, 1975 Agreement). These reports were to be prepared and submitted on time tables set by the management agreement, and by applicable federal regulations.

In undertaking all of these activities the agent was obliged to work in close cooperation with the project membership. Under the management accords the agent was to confer with the membership on all management decisions. (Paragraph 21, 1975 Agreement). The agent was also to perform an educational function at the cooperative, explaining to the members the nature of cooperative housing.

In return for these services the agent received compensation as specified by the agreements. Under the 1975 management contract the agent's compensation was tied to gross collections, with the agent receiving 7% of such collections. Gross collections were defined under the agreement to include payments by residents, government subsidy payments, and any other income earned by the development. (Paragraph 26, 1975 Agreement).

At the time the parties entered into these accords they had every reason to believe that the St. Croix Labor Union Mutual Homes Development would operate successfully. Wilcox and Technico-op had considerable experience in the management of this type of project. Yet, in fact, the St. Croix development encountered serious ongoing problems from its inception. These problems eventually led the project to default on its mortgages and precipitated the dismissal of the plaintiffs as managing agents.

The root cause of these problems can be found in certain decisions made early in the relationship between the plaintiffs and St. Croix Labor Union Mutual Homes, Inc. The first of these decisions involved the selection of Wilcox as the managing agent for this project. It is undisputed that Roger Wilcox is an experienced management agent who has successfully developed a number of low and moderate income housing projects throughout the United States. Yet it is also clear that St. Croix Labor Union Mutual Homes, Inc. was Mr. Wilcox's first venture into federally subsidized housing on St. Croix. Thus Wilcox had little knowledge of conditions unique to St. Croix, conditions which would complicate his task enormously. Several of these conditions, specifically the island's chronic shortage of potable water and the large alien population living on St. Croix, would later cause significant hardships at this project.

Wilcox further exacerbated this problem by adopting a management style that was particularly ill suited for the St. Croix project. Wilcox elected to operate this development as an absentee manager. He maintained direct control over the operations of St. Croix Labor Union Mutual Homes from his headquarters in Connecticut. All major cash disbursements and cooperative management decisions were made out of this office, far removed from the project itself. As the history of this project reveals, Wilcox's frequent visits to the development site were no substitute for the ongoing presence of a competent manager.

Moreover for the most part the individuals staffing the on-site office of Technico-op were not equal to the responsibility of supervising this development. A few of Wilcox's personnel selections were particularly unfortunate. Testimony received at trial indicated that at least one on-site manager

may have been involved in the theft of funds from the residents' subscription account. In addition, witnesses at trial described a catalogue of improprieties engaged in by the maintenance supervisor at St. Croix Labor Union Mutual Homes. In sum, without competent on-site supervision, the potential existed for disastrous mismanagement of this project.

That potential tragically was fulfilled. Almost from the outset project management was unable to adequately perform many of the duties assigned to it under the management agreement. Occupancy of this development was consistently below projections and fell significantly below the occupancy rates at other comparable projects. Through the mid-1970's the vacancy rate at St. Croix Labor Union Mutual Homes averaged 15 to 20%. At the same period of time other comparable low and moderate income housing units on the island were reporting vacancy rates of only 2 to 3%.

In order to combat these growing vacancies Technico-op engaged in several improper marketing activities. For example, Technico-op authorized the payment of finders fees to individuals who obtained residents for the cooperative. Payment of such finders' fees was strictly forbidden by HUD regulations.

In addition Technico-op promoted this project by offering prospective residents immediate Section 8 assistance. In effect, Technico-op allowed these residents to pay their monthly charges as if they were part of the Section 8 program without certifying them as eligible for this subsidy. This type of unauthorized Section 8 assistance was prohibited by the Department of Housing and Urban Development. Moreover, certification of residents was a prerequisite to receipt of government rent subsidies. Therefore the cooperative did not receive a corresponding subsidy payment for the partial rent payments made by these ineligible residents. Ultimately these unauthorized Section 8 assistance grants cost the cooperative $8,500.

The high vacancy rate at St. Croix Labor Union Mutual Homes was, in part, a product of the living environment at that project. The Mutual Homes housing development was both poorly designed and poorly constructed. The roofs leaked, infiltrating the walls of the buildings with water. Much of the plumbing system was incomplete, with toilets draining directly into the adjacent grounds. Consequently sewage frequently backed up in these pipes, flooding individual apartments. The stoves, refrigerators and fixtures in many of the apartments were often inoperable. The apartments themselves were not equipped with individual utility meters. Without such meters management was unable to accurately allocate utility costs. Ultimately, following the discharge of Technico-op, over $100,000 was spent to correct these deficiencies.

The deteriorating physical condition of the complex was further exacerbated by indifferent maintenance. Laundry facilities at the project were in constant disrepair. Vacant apartments were broken into and left vandalized. Graffiti marred the walls of the buildings. Garbage and abandoned cars were found throughout the grounds. Little was done to correct the structural defects in the development. Preventive maintenance on the project was virtually non-existent.

However, the problems at St. Croix Labor Union Mutual Homes went beyond the physical condition of the project. They also encompassed a host of other deficiencies by management.

For example not only was the managing agent unable to sell vacant units, it was also unable to collect the monthly charges owed by residents in many of the units it did sell. Many of these residents were thousands of dollars in arrears. As early as August of 1973 delinquent monthly charges at this development totalled $14,445. This situation progressively worsened. By August of 1974 these arrearages had reached $20,135. By May of 1975 they totalled $26,-

861. By December 31, 1976 delinquent monthly charges exceeded $36,000. By this time 164 residents at the project were behind on their monthly charge payments. 13 of these residents owed the cooperative amounts in excess of $1,000. These delinquencies, coupled with the low occupancy rate at this complex, dramatically reduced the income of the cooperative.

In addition living conditions at St. Croix Labor Union Mutual Homes were worsened by Technico-op's inability effectively to provide utility service for the development. Water is in chronic short supply on St. Croix. Therefore, it was of the utmost importance that a constant supply of potable water be provided to this development. The plaintiffs failed, however, to insure that such a supply would be available.

As early as August of 1973 water was being rationed at this project. At that time water service to the project was shut off by the managing agent from 9 a.m. to 4:30 p.m. three days a week. Water was still being rationed at St. Croix Labor Union Mutual Homes as late as September of 1975.

These water problems were compounded by a dispute which arose between Technico-op and the St. Croix Water and Power Authority (WAPA), the island's public water company. Technico-op had fallen behind in its water payments, eventually accruing a debt of some $64,000 to WAPA. Because of these serious ongoing delinquencies WAPA terminated water service to the project and instituted suit to recover the amounts owed to it. With the termination of this service Technico-op was forced to rely upon a private water carrier, Schuster Supply Co., to provide for the needs of this development. The cost of water service through this private company was significantly higher than public water.

The plaintiffs also encountered difficulties with electrical service to this project. As originally designed the development was not equipped with individual electric meters for each cooperative apartment. Therefore, it was impossible to accurately allocate the costs of electrical service to individual residents of the project. Recognizing this Technico-op had individual electric meters installed in each apartment. This, however, did not prove to be a satisfactory solution to the problem of allocating electrical costs. Because the meters were within the apartments and not readily accessible to utility company employees the utility refused to read them. When the managing agent and its employees attempted to conduct their own meter readings, resistance by residents prevented them from obtaining access to many of the apartments. Thus, the managing agent was forced to continue its practice of allocating electrical costs on the basis of usage estimates. These estimates were frequently inaccurate, resulting in persistent deficiencies in the amount recouped from residents for electric power.

Management also failed in several particulars to maintain good working relations with the cooperative membership. The membership had little understanding of the concept of cooperative housing. Most regarded themselves as tenants, not property owners. While Technico-op provided residents at St. Croix Labor Union Mutual Homes with some information regarding cooperative housing, there was no systematic effort made to educate the members of the cooperative on their rights and duties.

Similarly the management agent did not communicate with the cooperative's Board of Directors. These directors who were elected by the cooperative membership, frequently complained that they were not consulted on project management decisions. Both Mr. Wilcox and Mrs. Ascescio, a member of the cooperative board, testified to the problems in communication between Technico-op and St. Croix Labor Union Mutual Homes. Ultimately the relationship between the managing agent and cooperative membership became almost adversarial, with each side maintaining a deep distrust for the other.

Not surprisingly, the confusion which existed at the housing development itself was

also reflected in the financial picture of this project. The high vacancy rate at St. Croix Labor Union Mutual Homes dramatically reduced the income available to the project. This problem was compounded by the growing number of delinquent accounts receivable for the development. The agent's failure to collect these delinquent accounts further reduced the project's income, leading to severe cash flow problems.

These cash flow problems were exacerbated by Technico-op's failure to keep an accurate account of its obligations. Accounts payable at this project were, quite accurately, characterized as being out of control. In fact at many times Technico-op appears to have had no clear idea of what its current accounts payable were. Evidence received at trial revealed that the managing agent either failed to pay or was delinquent in paying insurance premiums, utility bills, federal and local taxes, and mortgage payments.

Of these delinquencies the most serious involved the mortgage payments. By the time Wilcox and Technico-op were discharged as managers at St. Croix Labor Union Mutual Homes, in March of 1977, the mortgages on both Phase 1 and Phase 2 were on the verge of default. These defaults occurred despite the fact that Wilcox had previously applied for, and obtained, mortgage modifications on both phases. These defaults continue to this day. For example in January of 1981 Phase 1 of this development had delinquent mortgage payments totalling $580,000.

In sum, accounting practices at St. Croix Labor Union Mutual Homes consisted of a catalogue of improprieties. No effective control existed over accounts receivable or accounts payable. Obligations were not paid in a timely manner; nor were cash receipts promptly recorded. In fact, some cash receipts were apparently stolen by employees of the managing agent. Financial reports were not provided in accordance with the time table set in the management

agreement. Once delivered, these reports were frequently incomplete or inaccurate. Finally, in order to meet its obligations the managing agent, on occasion, commingled funds. Monies obtained from Phase 1 were used to meet the obligations of Phase 2. Funds earmarked for maintenance and repair of the development were spent on legal fees and for servicing the mortgage.

Ultimately these problems and shortcomings pyramided one upon the other until, in the spring of 1977, the Department of Housing and Urban Development determined that Technico-op had to be removed as the managing agent at St. Croix Labor Union Mutual Homes. Accordingly in March of 1977 Mr. Wilcox was instructed to terminate all operations at the St. Croix development and to turn all records over to the Department.

## II. DISCUSSION

Title 1, Section 4, of the Virgin Islands Code, provides that:

> "The rules of the common law, as expressed in the Restatements of the law approved by the American Law Institute, and to the extent not so expressed, shall be the rules of decision of the courts of the Virgin Island . . . in the absence of local laws to the contrary."

■ The instant case involves a contract dispute between an agent and its principal. In this case counsel have referred us to no specific local laws governing the relationship between principals and agents and our independent research has found none. Therefore, in the absence of any specific local law, the principles enunciated in the restatements of law will govern the rights and duties of these parties. *Skeoch v. Ottley,* 377 F.2d 804, 810 (3d Cir.1967).

In their complaint the plaintiffs demand payment of certain management fees allegedly owed them and reimbursement of expenses incurred as managing agent for

this cooperative. These fees and expenses total $71,244.38.[2]

These fees and expenses can be broken down into six specific items of damages. The first of these items is comprised of the management fees which the plaintiffs allege are still owed by the cooperative for services rendered at Phases 1 and 2 of the project in the spring of 1977. This item amounts to $18,230.10. The second item of damages consists of certain reimbursable expenses incurred by Technico-op while managing this project in the spring of 1977. These expenses, which are related to the plaintiffs' unpaid management fees total an additional $27,635.11.

Plaintiffs' third principal damage claim involves a loan made by Technico-op to the cooperative in April of 1973. This loan was an advance by the managing agent on the residents' cooperative subscription account for Phase 2 of the project. According to Mr. Wilcox at the time this advance was made it was contemplated that incoming residents would reimburse Technico-op for this expense as these residents occupied Phase 2 of the development. By April of 1977, $4,107.39 of this advance had not been repaid to Technico-op. It is this amount that the plaintiffs are now claiming from the cooperative.

The fourth item of damages sought by the plaintiffs is an advance made by Wilcox out of his own personal funds in January of 1977. This advance was provided to the cooperative in order to complete the January 1977 mortgage payment on Phase 1 of the project. At the time this advance was made the cooperative was experiencing severe cash flow problems and was unable to meet many of its current obligations. Therefore, Wilcox, as managing agent, used his own personal funds to meet the mortgage obligation of the cooperative and prevent default on that mortgage. The amount of this advance was some $5,000.

The plaintiffs' fifth specific damage claim is made up of two accounts paid by

Technico-op on behalf of St. Croix Labor Union Mutual Homes in May of 1977. These two bills were for accounting supplies and work order forms provided to the cooperative. The cooperative had incurred these two obligations during the winter of 1976–1977, while Technico-op was still acting as the management agent for this project. The total amount of these bills was $1,271.78.

Finally, item six on the plaintiffs' list of damages consists of a $15,000 payment made by Technico-op in settlement of the lawsuit brought against St. Croix Labor Union Mutual Homes by the Virgin Islands Water and Power Authority. At the time of this payment the cooperative was engaged in the final closing for Phase 2 of the project. As part of this final closing a settlement had to be obtained in the outstanding lawsuit against St. Croix Labor Union Mutual Homes. In order to reach this settlement Technico-op, Inc. agreed to loan $15,000 to Phase 1 so that the cooperative would have that money available to make the first payment called for in the consent judgment entered in this lawsuit. This $15,000 was paid by Technico-op out of its management fees. Technico-op provided this money to the cooperative on a non-interest bearing basis. This loan by Technico-op to the cooperative was approved by the President of the cooperative association, and by representatives of the Department of Housing and Urban Development. Technico-op now contends that this expense is properly an expense of the cooperative for which it should be reimbursed.

The first item of damages sought by the plaintiffs requires little discussion. At the outset the plaintiffs demand payment of certain management fees allegedly owed to them. We feel, however, that the plaintiffs are barred from any recovery on this claim by their own failure to properly manage this development in accordance with the management agreement.

---

**2.** Originally the plaintiff had claimed damages of $72,400.88. At trial, however, they aban-doned $1,156.50 in claims leaving a balance of $71,244.38.

The relationship between a principal and its agent rests upon certain mutual obligations. These obligations are established, in part, by the agency agreement. See Restatement Second of Agency § 376. But these obligations also arise by force of law. Agency is a fiduciary relationship. Restatement Second of Agency § 13. Thus an agent owes a duty to his principal to act in good faith and in accordance with the agency agreement existing between the parties. See Restatement Second of Agency § 377. Moreover, an agent must exercise care and skill in the performance of his duties. Restatement Second of Agency § 379. An agent is also obliged to refrain from any conduct which brings disrepute upon its principal. Restatement Second of Agency § 379.

Specifically, the agent must keep and render accounts to the principal of all financial affairs which the agent has handled on behalf of the principal. Restatement Second of Agency § 382. The agent must also obey the directives of his principal and act only as authorized by that principal. Restatement Second of Agency §§ 383, 384(1). Finally an agent, such as Mr. Wilcox, who holds himself out as possessing particular skills or talents in a field assumes an obligation to exercise a greater degree of care and skill in the performance of his duties. See Restatement Second of Agency § 379(1); 3 Am.Jur.2d Agency § 305.

The principal's obligation to pay its agent is directly related to the agent's performance of these duties. Therefore, failure by an agent to perform these duties, or to perform according to the agency agreement, will defeat any claim by the agent for compensation. See Restatement Second of Agency § 469.

In this case we feel that the plaintiffs' performance as managing agent at St. Croix Labor Union Mutual Homes failed to meet the standards set by law and by contract. Technico-op's seven year performance at this project is a chronicle of failure. Throughout this entire period the plaintiffs did not demonstrate reasonable skill or care in performing many of the duties assigned them by the management agreement. They did not render full and complete accounts of their service to the cooperative. As a result of these failings the physical and financial condition of the cooperative declined dramatically. By their failures the plaintiffs brought disrepute upon their principal, the cooperative. The failure of the plaintiffs to competently perform as managing agent brought this cooperative to the brink of insolvency. These failures led to a lawsuit against the cooperative; hostility between cooperative membership and management; and a significant decline in the quality of life at the cooperative.

Accordingly, we conclude that these failures to competently manage defeat the plaintiffs' claim for management fees. Therefore, we will deny the plaintiffs any recovery of these fees.

Similarly the plaintiffs' claim for reimbursement of their April 1973 subscription payment requires little discussion. At the time the Technico-op advanced these funds to Phase 2 of the development Mr. Wilcox specifically disclaimed any intention to look to St. Croix Labor Union Mutual Homes for repayment of these monies. In a letter to Mr. Enrique Sanz, Area Administrator for the Department of Housing and Urban Development, Wilcox represented that "Technico-op will *not* look to the cooperative corporation for reimbursement of any amount which it has advanced [to the Phase 2 subscription account]". (emphasis in original). In the face of this clear disclaimer by Mr. Wilcox the plaintiffs' present claim for reimbursement of this subscription payment must be denied.

The plaintiffs also demand reimbursement of a personal advance made by Wilcox in January 1977 to complete the January mortgage payment on Phase 1 of

this development. This advance was made by Wilcox in a series of transactions conducted in Connecticut. As a result of these transactions some $5,000 was transferred from Mr. Wilcox's personal accounts into the St. Croix Mutual Homes Account for Phase 1. These funds were later used in part to pay the January 1977 mortgage payment on Phase 1.

It is undisputed that these transactions in fact did occur. However there is absolutely no evidence on this record which indicates that St. Croix Labor Union Mutual Homes approved of these transactions or guaranteed repayment to Wilcox of these funds. In fact these transactions appear to be motivated by Wilcox's desire to avoid discharge by the Department of Housing and Urban Development.

In order for the plaintiffs to recover this personal advance by Wilcox they must show some agreement by the cooperative to repay these monies. This they have failed to do. Therefore, we will also reject this claim in its entirety.

The plaintiffs' three remaining damage claims share several elements in common. Each involves expenditures made by Technico-op for the direct benefit of St. Croix Labor Union Mutual Homes. Moreover, each of these expenditures was expressly authorized either by the cooperative directly or by the Management Agreement prior to being made. Thus we believe that these three items differ in kind from the prior damage claims made by the plaintiff. We conclude that these three items are expenses properly charged to the defendant. Accordingly, we will allow the plaintiffs to recover these three expense items in this action.

■ The first, and largest, of these items consists of the reimburseable expenses encountered by the plaintiffs while managing this project. These expenses consist primarily of the wages and benefits paid by Technico-op to its on-site manager at the cooperative. Under the management agreement the cooperative was obligated to "reimburse the agent for all compensation (including fringe benefits) payable to all personnel who are to be employed by the agent [on the development site]." Thus the management agreement specifically required that the cooperative reimburse the managing agent for these expenses. The plaintiffs' claim for these reimburseable expenses was reviewed by the Department of Housing and Urban Development and, with some modification, was approved. Accordingly we conclude that the plaintiffs are entitled to payment of these expenses in the amount of $27,635.11.

■ Similarly the plaintiffs claim that they should be reimbursed for the expenditure of some $1,271.78 made by Technico-op in May of 1977. This money was spent by the plaintiffs in order to pay for accounting systems and supplies previously provided to the cooperative. Once again these accounting expenses are specifically referred to in the management agreement as project expenses. (¶ 17(h) 1975 agreement). We feel, therefore, that the agent is entitled to be reimbursed for the funds expended by it in satisfaction of these cooperative expenses. Accordingly, we will grant judgment in the plaintiffs' favor on this damage claim.

■ Finally the plaintiffs demand return of a $15,000 loan made by Technico-op, out of its management fees, to St. Croix Labor Union Mutual Homes. This non-interest bearing loan was made to the cooperative in order to provide funds for the settlement of the lawsuit between the cooperative and the Virgin Island Water Authority. The loan was made as part of Technico-op's efforts to obtain a final closing on Phase 2 of the St. Croix project. The loan was evidenced by a letter from Roger Wilcox to Jesus Reyes Bascaran, HUD's Director for the Carribean Area office. In this letter Wilcox fully set forth the terms of the loan. The letter was signed and approved by both the cooperative and the Department of Housing and Urban Development. Thus,

the loan, and the cooperative's obligation to pay the plaintiffs, were fully acknowledged in this letter. In the face of this express acknowledgement by the cooperative we are constrained to order payment by the defendant of this $15,000 loan.

 ▮ Thus we conclude that the plaintiffs are entitled to recover a total of $43,906.89 on their claims against the defendant in this action. This conclusion does not, however, signify the end of our inquiry in this matter. When an agent breaches the terms of his agency agreement or violates any of his fiduciary obligations to his principal he becomes liable to the principal for any losses occasioned by that breach. Restatement Second of Agency §§ 400, 401. A principal whose agent has violated any of these duties may assert the damages resulting from that violation as a set-off or counterclaim against any claims made by the agent. Restatement Second of Agency § 399(g).

In this case the defendant has asserted a counterclaim against plaintiffs, alleging that the plaintiffs' management of this project fell short of the duty of care owed to the cooperative and breached the terms of the management agreement between these parties. The defendant has claimed over $500,000 in damages as a result of the plaintiffs' negligent conduct.

We have already concluded that the plaintiffs' conduct as managing agent for this project was, in some respects, tortious and a violation of the applicable management agreements. Accordingly, we must now determine to what extent the defendant has demonstrated loss to the cooperative as a result of this wrongful conduct by the plaintiffs.

The defendant's list of damages is extensive and includes some 20 separate items, as set forth in summary fashion below:

| | | |
|---|---|---:|
| 1. | Improper long distance telephone charges | $9,585.18 |
| 2. | Excessive management fees paid to plaintiffs | 15,158.00 |
| 3. | Unauthorized payments made by plaintiffs to collection agencies | 1,968.80 |
| 4. | Losses resulting from unauthorized certification of tenants for Section 8 assistance | 8,500.00 |
| 5. | Unpaid payroll tax expenses | 8,902.72 |
| 6. | Delinquent payroll tax penalties | 2,370.43 |
| 7. | Cost of restoring vandalized apartments | 70,712.00 |
| 8. | Anticipated costs for future restoration of vandalized apartments | 175,000.00 |
| 9. | Unspent sums designated for capital improvements | 18,000.55 |
| 10. | Mortgage late charges | 2,941.62 |
| 11. | Losses resulting from excessive vacancies at the project | 133,834.00 |
| 12. | Write off of bad debts at project | 45,191.99 |
| 13. | Waiting list-security deposits paid out after discharge of plaintiffs | 1,892.50 |
| 14. | Remaining balance in waiting list account | 1,341.76 |
| 15. | Unpaid insurance premiums | 2,828.00 |
| 16. | Other late charges | 5,341.62 |
| 17. | Theft loss unclaimed from surety company | 2,395.89 |
| 18. | Excess water fee payment made by plaintiffs | 28,545.00 |
| 19. | Excess management fee payments | 15,158.00 |
| 20. | Additional damages | 19,272.00 |
| | Total | $568,940.06 [3] |

 ▮ Several of these items require little discussion. For example the defendant is claiming as damages certain penalties and late charges incurred as a result of Technico-op's failure to make timely payment of payroll taxes and mortgage payments. These two items total $5,312.05. These expenses to the cooperative are a direct product of Technico-op's negligent management of this project. If Technico-op had adopted better accounting practices and kept accurate records of the accounts payable at this development these late charges and penalties would have never been incurred. Thus these expenses are causally related to Tech-

---

**3.** One of these items can be disposed of immediately. The defendant has apparently counted as what are alleged to be excess management fees of $15,158 twice when calculating its dam-

ages. (Compare item 2 with item 19.) Accordingly, we will consider the defendant's second claim for these management fees to be surplusage and order that claim stricken.

nico-op's negligence. Accordingly the defendant is entitled to judgment in its favor for these two items.[4]

■ Similarly the defendant's claim of $8,500 in damages resulting from Technico-op's unauthorized use of Section 8 subsidies is fully substantiated on this record. The plaintiffs granted certain residents of this project Section 8 rental assistance without first certifying them as eligible for such assistance. Because the plaintiffs failed to certify these individuals as eligible the Department of Housing and Urban Development did not forward the Section 8 subsidy payments to the cooperative for these residents. These subsidy payments form an important part of the income paid into the cooperative. Therefore plaintiffs' failure to obtain certification for these residents resulted in a direct loss of income by this project. The Department of Housing and Urban Development calculated this loss at $8,500 all of which we believe is properly assessed against the plaintiffs as damages.

■ Several other items claimed as damages by the defendant in its counterclaim require somewhat more detailed consideration. For example the defendant demands payment from the plaintiff of excessive long distance telephone charges, charges which it contends amounted to $9,585.18. Under the management agreement the cooperative was responsible for the cost of basic telephone service to the managing agent's on-site office. [¶ 22 1975 Agreement]. The managing agent, in turn, was responsible for all off-site overhead expenses, including telephone services. In our view long distance telephone charges between Technico-op's Connecticut office and the project are properly characterized as off-site overhead expenses. They are expenses which are incurred solely because

the managing agent wishes to operate the development as an absentee manager. Thus these expenses are incurred solely for the convenience of the managing agent, and not for the direct benefit of the project. Therefore, to the extent that the defendant can demonstrate that these telephone bills reflect long distance calls occasioned by Wilcox's absence from the project the cooperative is entitled to recover these amounts in its counterclaim.

The $9,585.18 claimed by the defendant, however, reflects the cost of all telephone service to the on-site office of Technico-op. Under the management agreement basic phone service to this office was the responsibility of the cooperative. Therefore, the figure claimed by the defendant must be reduced to reflect only long distance charges. These long distance charges amount to $8,377.50. Moreover, some of these long distance calls, specifically calls made to the Department of Housing and Urban Development, are properly project expenses. Therefore, these long distance phone expenses must be deducted to determine the proper measure of damages. At trial we received testimony indicating that some $48.15 of the long distance phone charges involved telephone calls to HUD. Deducting this amount from the total long distance phone expense we are left with a balance of $8,329.35, all of which we feel is properly allocated to the managing agent as an off-site expense. Therefore, we will allow the defendant to recover this amount in its counterclaim.

■ The defendant also contends that the plaintiffs overstated the amount of the management fees owed to them by the cooperative in the years 1975 and 1976. This resulted in an overpayment by St. Croix Labor Union Mutual Homes of some $15,-158.

---

4. We note, however, that the defendant has once again double counted items claims as damages in its counter claim. Defendant's list of damages contains an item referred to generally as "other late charges." This item consists entirely of the payroll tax penalties and mortgage late charges previously claimed. See Defendant's Exhibit CCC, Schedule E. Since defendant has already claimed and recovered these items once in this lawsuit we will strike this "Other late Charge" claim as surplusage.

Under the management agreement the agent's commission was tied to gross monthly collections by the cooperative. (¶ 26 1975 Agreement). Collections are actual receipts; funds paid to the cooperative. In calculating its commission Technico-op based its commission payments on accrued earnings and not actual cash collections. Since the project had extensive delinquent accounts receivable during these years accrued earnings would be significantly greater than actual cash receipts. Therefore, Technico-op overstated the commission to which it was entitled when it relied upon these accrued earnings as the basis for its calculations. The amount by which these commissions were overstated, $15,158, is properly claimed by the defendant as damages on its counterclaim. Therefore, we will allow the defendant to recover on this item on its counterclaim.

 The defendant also claims a right to damages resulting from the plaintiffs' mismanagement of this project's subscription deposit accounts. These claimed damages take two forms. First, the defendant alleges that the plaintiffs should reimburse the project for certain funds paid by the cooperative out of these accounts following the dismissal of Technico-op as managing agent. These payments total $1,892.50. In addition the defendant contends that Technico-op retained some $1,341.76 which had been held in these accounts. The defendant demands that these funds be returned to the cooperative.

We believe that the defendant should prevail only on the latter of these two claims. The record reveals that, in October of 1977, Technico-op closed out the St. Croix Labor Union Mutual Homes waiting list account and apparently retained the outstanding account balance, $1,341.76. This transaction occurred six months after Technico-op had been discharged as the managing agent of this project.

It is undisputed that these funds belong to the cooperative. On this record there can be no justification for the actions taken by Technico-op. Technico-op's retention of these funds is a fundamental breach of its fiduciary obligations as agent for the cooperative. See Restatement Second of Agency, §§ 13, 382 and 386. These obligations did not end simply because Technico-op had been discharged by St. Croix Labor Union Mutual Homes. The plaintiffs still had a duty to deal fairly with their principal and account to that principal for monies which they as agents had held in trust. This the plaintiffs failed to do. Accordingly, we will order the plaintiffs to credit these funds to the cooperative.

 The defendant has also alleged that the plaintiffs' mismanagement of these funds later forced the cooperative to pay some $1,892.50 out to its members. On this claim we feel that the defendant has not sustained its burden of proof. The payments which are the subject matter of this claim were made two to four years after Technico-op had been discharged as managing agent. They were made by Technico-op's successor as managing agent as a result of an independent business determination that such payments were appropriate. They are, therefore, remotely related to Technico-op's original management of these accounts.

Because these payments result from the independent acts of third parties taken several years after the termination of Technico-op as managing agent at this development we will deny the defendant's claim for reimbursement of these payments. Accordingly defendant's damages arising out of the plaintiffs' mismanagement of the subscription deposit accounts at St. Croix Labor Union Mutual Homes will be limited to $1,341.76.

 Yet another item of damages sought by the defendant relates to charges made against the cooperative by Technico-op in connection with efforts to use private collection agencies to recover delinquent accounts. These collection agency expenses

were paid by Technico-op out of project funds. These expenses total $1,968.80.

Under the management agreement the managing agent was directly responsible for the collection of all monthly charges. (¶ 10, 1975 Agreement). Nothing in the agreement authorized the managing agent to hire an independent collection agency to perform this function; nor did the management agreement authorize the hiring of an outside agency at the project's expense.

In fact the hiring of a collection agency at the project's expense runs contrary to the management agreement. That agreement specifically allocated responsibility for the collection of delinquent monthly charges to the managing agent. In return for performing this duty the agent received a monthly commission from the cooperative.

To allow Technico-op to hire an outside agency to perform one of its duties, and then bill the cooperative for this service, would defeat this allocation of responsibility. In effect, the cooperative would be paying for the same service twice. Because we believe that these collection expenses are not properly charged to the project, we will grant defendant's counterclaim with respect to this item.

The remaining items claimed by the defendant on its extensive list of damages are without merit.

■ Some of the charges which the defendant attempts to assert against the plaintiffs are, quite simply, without support on the record. For example, the cooperative demands reimbursement of payroll taxes and insurance premiums paid by it following the discharge of the plaintiffs. These items, which total $11,730.72, were project expenses which the cooperative was required to pay. They are not, in any sense, damages properly assessed against the managing agent. Therefore, the defendant's claims for reimbursement of these funds must be denied.

■ Defendant has claimed as damages the cost of restoration of vandalized units. The damage to apartments by vandalism, either done by departing tenants or by un-

known third parties cannot be assessed against the managing agent for any clearly proven fault of the agent. The testimony shows a variety of reasons for dissatisfaction by occupants, due to initial construction faults of the contractor. A suit was brought against the contractor and a settlement obtained by the cooperative. It also appears that Wilcox was bringing this matter to the attention of the cooperative members as early as 1974, asking their assistance in reducing damage. It appears that a certain amount of damage may be expected in housing units such as these, either from occupants or from unknown third parties invited by the existence of vacant units. We can find no basis in the evidence to establish the liability of plaintiffs for the loss.

With respect to the estimated repair costs for future repairs to apartments damaged by vandalism for the same reason as set forth on the claim for actual repairs, and in addition, because of the speculative nature of the evidence of these costs, we also deny this element of the claim.

Defendant has asserted a claim for unspent sums designated for capital improvements. This claim is based on the argument that as a result of the settlement of a lawsuit between the defendant cooperative and the original contractor, a sum of about $35,000 was realized, not all of which was expended by the plaintiff managing agent for repairs. (See FNMA letter of June 14, 1977). We cannot find any exhibit by which Wilcox has accounted for the $18,-800.55 which FNMA has claimed except that a prior report of Wilcox dated May 19, 1977 accounts for moneys charged to the "capital improvement account."

■ Defendant counterclaims for the sum of $45,191 as an excessive bad debt write-off by plaintiff manager. To arrive at this figure the defendant offered a computation showing that the bad debt write-off of allegedly similar projects in St. Thomas and St. Croix over a period of years between 1974 and 1980 disclosed an average bad debt write-off of 2.1% of net income. The computation concludes with the actual write-off for Phase I for the years 1975 and

1976, and for Phase II in 1976 far exceeded this percentage. Establishing a fair bad debt factor to be used of 2.1% for each of these years, the computation shows a bad debt write-off in excess of 2.1% for the years 1975 and 76 in Phase I and 1976 in Phase II of $45,191. There is no claim that this amount was ever collected and misapplied, nor that the bad debts were collectible and should not have been written off as a good accounting practice.

We do not believe that such a method of computation is sufficient to establish liability for the amount claimed. There is no reason to conclude that the bad debts for this project should be governed by the same ratio as other projects. In fact the circumstances of this project as revealed by all of the evidence would indicate that a greater bad debt problem was likely to arise here than in other projects, not entirely because of the failures of plaintiff in carrying out its management function. Therefore, we will deny this item of the counterclaim both because of the speculative basis of calculation as well as the failure of proof as to the fault of plaintiff in this respect.

▊ Defendant counterclaims for $133,-834 for losses due to excessive vacancies in this project. The basis for this calculation was a calculation by the witness Bronstein that other allegedly similar projects had a much lower vacancy rate. He established the average fair vacancy factor for a period from 1974 through 1980 to be 2.1%, and finds the defendant's factor to be in excess of this for all years compared except for the year 1974 in Phase I. The witness determined the dollar value of his fair vacancy rate and subtracts this from the dollar value of actual vacancies to achieve his estimate of the dollar value of excess vacancies. He adds this excess for all the years in question, deducting the one year result for a better than average year, and concludes that the defendant's loss is $133,834.

We reject this method of computation to establish this result. The evidence fails to show a fair basis of comparison between this project and other projects used as standards; on the contrary it shows many reasons for vacancies in this project beyond the

control of the managing agents. We find no reason in the evidence to support a charge that this loss was primarily due to the fault of the managing agent. Many other contributing factors aside from the managing agent's failure led to this result, and proofs are insufficient to determine the degree of fault of the managing agent as against the contribution of these other factors.

▊ Defendant counterclaims for a loss of $2,395.89 attributed to a misappropriation by an employee of plaintiff. The employee was confronted with this and entered into an agreement to pay this amount back to the project by installment payments. There is no evidence that this is not being repaid by the employee. The audit report on which defendant relies does not ascribe this loss to plaintiffs' failure to obtain a required surety bond for the employee.

▊ For a period of time the local water supply utility shut off water service to the project. There was considerable dispute about the reason for this, the project manager alleging the failure of the utility to bill properly. The matter eventually developed into a lawsuit, resulting in a compromise settlement, in which plaintiff advanced $15,000 of its own funds. We have previously allowed plaintiff to recover this sum in considering plaintiff's claim. During the controversy over the water bill, plaintiff ordered water to be delivered by a private water supply company, at a cost of $81,-556.50. Defendant deducts the cost of a comparable quantity of water from the public utility company and claims the balance as an excess payment for which plaintiff should be charged. The evidence to support any liability of plaintiff for this sum is not sufficient to place that liability on plaintiff by reason of plaintiff's fault.

▊ Defendant claims a sum of $19,270 as "additional damages". This claim is based on defendant's argument that since plaintiff based its claim for management fees for 1975 and 1976 on income calculated on an accrual basis rather than actual cash received, resulting in an overpayment which we have recognized in Section 19

above, the same percentage of overpayment derived from the 1975 and 1976 payments (38%) should be applied to the prior years 1972–1973 and 1974. This would reduce the total fees paid for 1972, 1973 and 1974 by $19,272.

There is no evidence except pure speculation to prove that plaintiff wrongfully calculated its management fees in 1972, 1973 and 1974 by treating rental income on an accrual basis, hence this claim is denied.

### CONCLUSION

Therefore, in accordance with the findings of fact and conclusions of law stated above, judgment will be entered for the plaintiffs in the amount of $43,906.89, and for the defendant on its counterclaim in the amount of $40,609.96. No interest prior to entry of judgment will be assessed.