[No. 7798–5–III.   Division Three.   November 19, 1987.]

DONALD R. HASKELL, ET AL, *Respondents,* v. CALVIN RAUGUST, ET AL, *Appellants.*

*William J. Powell* and *Powell & Morris,* for appellants.

*Richard W. Kuhling* and *Paine & Hamblen,* for respondents.

McINTURFF, C.J.—Donald Haskell, realtor d/b/a Donald R. Haskell Realty, and James Roeber, realtor d/b/a Spokane Industrial Realty, sued Calvin and Leona Raugust, individually and the marital community, and Calvin Raugust d/b/a Skyline Investment Co., Evergreen Trust Co., Progress Development Co.,[1] and Cal–Lee, Inc., for real estate commissions due as a result of the sale of property known as the Flour Mill site. The court awarded judgment against Mr. and Mrs. Raugust personally and against the named businesses for $52,500 (6 percent of $875,000) plus

---

[1]We note there is no evidence in the record pertaining to Progress Development Co. and that the judgment entered by the trial court does not include it as a named defendant.

prejudgment interest and costs. Mr. Raugust appeals, alleging error in the finding of liability, or, in the alternative, the imposition of personal liability. We reverse.

## JAMES ROEBER

In the fall of 1978, while manning a trade booth at the convention center in Spokane, Mr. Roeber met Robert Houck, branch manager for Unigard Mutual Insurance Co., who indicated Unigard was looking for a new office building. Mr. Roeber voluntarily researched several properties, prepared presentation folders for perhaps a half dozen principal sites and presented them to Mr. Houck and a representative of Unigard's home office in Bellevue. Included in the presentation was property located just west of the Flour Mill, owned by Skyline Investment Co., one of Mr. Raugust's business entities.

Mr. Roeber approached Mr. Haskell, who contacted Mr. Raugust and, as a result of his inquiry, indicated the property could be purchased for a million dollars cash. In early December 1979, Unigard agreed to make an offer. A real estate purchase and sale agreement, dated December 19, 1979, was prepared. On January 18, 1980, it was approved by Unigard and then later signed by Mr. Raugust as follows:

Seller: Skyline Investment Co.,
   Evergreen Trust Co., Trustee
   by Calvin Raugust Ex. Trustee (signed)
   Calvin Raugust, Exec. Trustee

The amended purchase price was $975,000 cash subject to several contingencies, including an agreement to split the real estate commission 50/50 between Mr. Roeber and Mr. Haskell. After acceptance by Unigard, the offer was to be submitted to the trustees of Evergreen Trust Co. for final approval.[2]

---

[2]Title to the Flour Mill site was held by Skyline Investment Co., a business trust organized by Mr. Raugust. Nominee title was in the name of Cal–Lee, Inc., a Washington corporation, also organized by Mr. Raugust. Evergreen Trust Co. was the trustee of Skyline Investment Co.

On January 26 or 27 trustees Calvin Raugust, Dale Raugust and Terry Raugust summarily rejected the offer. Unigard's reaction was disbelief, shock and embarrassment, as they had already announced the purchase publicly. From that time, Unigard refused to initiate any negotiations with Mr. Raugust.

After the rejection and until the property was sold, Mr. Roeber documented some 40 contacts with Unigard, 11 of which related directly to the Flour Mill property, and one with Mr. Haskell shortly before the property was sold. In December 1980, Mr. Raugust sent a letter to Unigard suggesting they renew negotiations without involving realtors. On February 11, 1981, Mr. Raugust met with Mr. Roeber, soliciting his help as agent in the sale of four of his properties including the Flour Mill site. When questioned about Mr. Haskell's involvement, Mr. Raugust replied: "Don't you worry about Don Haskell. I'll take care of the commission for him. I want somebody that is going to do a more aggressive job of marketing or selling these properties for me. That's why I want you to handle them." However, no listing agreements were signed.

During February 1981, Mr. Roeber participated in subsequent meetings with Mr. Raugust. Mr. Raugust was reluctant to proceed with the Flour Mill site, claiming his hands were "tied" until July because of his association with Warren Mathwig. The record also indicates Mr. Raugust was involved with negotiations on this same site with another developer. During a conversation with Mr. Roeber on May 25, 1981, Mr. Raugust indicated they could proceed because Mr. Mathwig had filed for bankruptcy.

During the summer and early fall of 1981, disputed evidence indicates Mr. Roeber solicited offers from Mr. Raugust on behalf of Unigard, but was unsuccessful. Mr. Raugust indicated he was too busy with the harvest, but would contact him later.

On October 1, 1981, Mr. Raugust signed a listing agreement with Select Realty, agreeing to sell the Flour Mill site for $1,250,000. He agreed to pay a $10,000 fee for realty

services, $9,000 of which was to go to Dale Raugust, his son and the listing salesman. On October 10, 1981, Mr. Roeber wrote Mr. Raugust a letter requesting he fill out the attached earnest money forms for sale of the site; a copy went to Mr. Houck and a blind copy to Mr. Haskell. Unigard agreed October 16, 1981, to purchase the property for $1,050,000 cash with the proviso: "[o]wner shall indemnify and hold harmless Unigard from any claims by real estate brokers or agents for commissions or other entitlements arising out of a claimed agreement or arrangement by owner or its representatives for listing of the property or solicitation of buyers of the property." The offer was accepted October 19 by Mr. Raugust, in his capacity as president of Cal–Lee, Inc., and the sale closed October 20, 1981.

## DONALD HASKELL

Mr. Haskell, a licensed real estate broker, first met Calvin Raugust in 1975. Since that year he earned real estate commissions as a result of selling properties for Mr. Raugust. On May 1, 1978, Mr. Haskell and Mr. Raugust, acting as trustee for Borderline Enterprises, Inc. Employee's Pension Fund & Trust, entered into a written agreement regarding delinquent lease payments owed by Mr. Haskell to Borderline on what was known as the Lower Crossing property.

Paragraph 2.(b) of the agreement stated:

Donald R. Haskell may satisfy his obligation under the aforementioned note and under the aforementioned lease agreement and sales agreement by providing or not charging Borderline Enterprises, Inc. for $25,000.00 worth of Real Estate Commissions at 6% of the purchase or sale price, on the purchase or sale of property by Borderline Enterprises, Inc. . . .

Real Estate commissions provided to Calvin Raugust as an individual on property purchased or sold by Calvin Raugust will also be counted towards the $25,000.00 worth of free commissions that Donald Haskell has agreed to provide Borderline Enterprises, Inc., in settle-

ment of the aforementioned lease agreement and sale agreement.

The agreement was to terminate in 5 years; Mr. Raugust agreed it was still in effect at the time the Flour Mill property sold. Mr. Haskell stated he sold properties owned by Calvin Raugust after 1980 and that a commission was paid under this agreement and not through a separate listing agreement.

The dispositive issue is whether Mr. Raugust, individually or in any other capacity, was liable for the real estate commission.

The first cause of action of the realtors' complaint states the commission is owed because the realtors, as authorized agents for Mr. Raugust, were the procuring agents and the cause of the sale between Mr. Raugust and Unigard.[3] The first earnest money agreement, signed and then rejected by the Raugust family, provided for a 6 percent commission to be split 50/50 between Mr. Roeber and Mr. Haskell, with the obligation being the responsibility of the seller. The trial court concluded in its memorandum opinion the realtors were not entitled to recover under the 1979 agreement.

The record reveals there was no listing agreement between Mr. Roeber and Unigard or Mr. Raugust. Rather, Mr. Roeber admitted he was relying on splitting the commission earned by virtue of an alleged agreement between Mr. Haskell and Mr. Raugust.[4]

The only written agreement between Messrs. Raugust and Haskell was the contract to reduce the debt owed by Mr. Haskell to Mr. Raugust arising out of the development of the Lower Crossing property. The agreement specifies a

---

[3]In an agreed order entered June 22, 1984, the second cause of action was dismissed and leave was granted to amend the original complaint. No amended complaint could be found in the record.

[4]Mr. Roeber states:

"Q Who were you representing in that sale?

"A [Mr. Roeber] I brought an offer from Unigard but I've always considered myself as representing the seller as subagent for the listing broker."

commission of 6 percent on the purchase or sale of property by Borderline Enterprises, Inc., or those "provided to Calvin Raugust as an individual on property purchased or sold by Calvin Raugust . . ." No mention is made of Cal–Lee, Inc., or Skyline Investment Co., the sellers here. Mr. Haskell testified he sold properties belonging to Mr. Raugust and/or his trusts and corporations and received a commission based on this agreement rather than a separate listing agreement. However, there is no evidence in the record Mr. Haskell was instrumental in negotiating the sale of the Flour Mill site. The only evidence of his involvement was the first contact Mr. Roeber made inquiring whether the property was owned by Mr. Raugust and whether he was interested in selling. Mr. Haskell was also present at the meeting when the initial Unigard offer was presented on January 18, 1980, and the presentation of the counterproposal involving additional contingencies at the end of January 1980.

The Washington cases cited by Mr. Roeber in support of his contention he was entitled to a commission as a procuring agent involve situations where an employment agreement was undisputed.[5] Here, Mr. Raugust alleges there was no agreement to employ either Mr. Roeber or Mr. Haskell as his agent. Nor is there any finding by the court which refers to an agreement to employ the realtors. The court's decision to impose liability is based on its conclusion the realtors were the procuring agents for the sale. However, our review of cases outside this jurisdiction where the employment agreement is disputed leads us to conclude an employment agreement is necessary. In *Kohn v. Cohn,* 567 S.W.2d 441, 446–67 (Mo. Ct. App. 1978) the court stated:

---

[5]*See Mueller v. Seefried,* 54 Wn.2d 792, 345 P.2d 389 (1959); *Center Invs., Inc. v. Penhallurick,* 22 Wn. App. 846, 592 P.2d 685 (1979); *Bonanza Real Estate, Inc. v. Crouch,* 10 Wn. App. 380, 517 P.2d 1371 (1974); *Weaver v. Fairbanks,* 10 Wn. App. 688, 519 P.2d 1403 (1974); *Quadrant Corp. v. Spake,* 8 Wn. App. 162, 504 P.2d 1162, *review denied,* 82 Wn.2d 1004 (1973).

To establish the agency contract, it must appear that the owner authorized the broker to produce a buyer or lessee and that the broker agreed to do so under such circumstances that the owner had reason to know that the broker's services were not offered gratuitously but were undertaken with an expectation of compensation. *Smith v. Piper* [423 S.W.2d 22 (Mo. Ct. App. 1967)]. The contract of employment may be express or implied, *but its existence must be established before a broker may enforce his claim for compensation. Windsor v. International Life Ins. Co.* [325 Mo. 772, 29 S.W.2d 1112 (1930)]; . . .

. . . In order to raise an implied contract, the services rendered by the broker must have been performed under such circumstances that the recipient had reason to know that they were not offered gratuitously nor performed for some other person but with the expectation of compensation from the recipient. Further, the services rendered must have been beneficial to the person sought to be held liable. *Hoover v. Whisner,* [373 S.W.2d 176 (Mo. Ct. App. 1963)]; *Bennett v. Adams,* 362 S.W.2d 277 (Mo. [Ct.] App. 1962). *Where a broker approaches an owner and negotiates for the sale or lease of his property, no promise to pay for the broker's voluntary services will be implied if the owner is justified under the circumstances in presuming that the broker represents the prospective purchaser or lessee. Windsor v. International Life Ins. Co., supra.*

(Italics ours.) Here, Mr. Roeber made the initial inquiry of Mr. Raugust regarding the sale of the Flour Mill site. Mr. Raugust, through Mr. Haskell, indicated the property could be purchased and named a price. There is no evidence to suggest Mr. Raugust employed Mr. Roeber to be his agent; rather, given the circumstances, it was justifiable for Mr. Raugust to believe Mr. Roeber was representing Unigard. In *Montgomery v. Memorial Presbyterian Church,* 634 S.W.2d 201 (Mo. Ct. App. 1982) the court denied recovery to a broker who, representing the buyer, procured the sale but expected payment from the seller. Seller refused, stating broker was not his agent. The court was unable to find any evidence of contract of employment between the broker

and the buyer or seller.[6]

In *Ostendorf–Morris Co. v. Slyman,* 6 Ohio App. 3d 46, 47, 452 N.E.2d 1343, 1345 (1982) the court stated:

> Broker has the burden of proving that the brokerage employment contract existed. *A contract is not established by evidence that the broker was the procuring cause of the sale and introduced the buyer to the seller.* Nor does a broker's request for information about a seller's price and seller's response to that request create an implied employment contract.

(Citations omitted. Italics ours.) There, the court noted the broker's conduct indicated he was acting as the buyer's agent and could well have expected payment from him, rather than the seller, *Ostendorf–Morris,* at 48 (citing *Walsh v. Turlick,* 164 Conn. 75, 316 A.2d 759 (1972); *In re Coho,* 421 Pa. 448, 219 A.2d 657 (1966)).

Summarizing the facts, and assuming there is sufficient evidence Mr. Roeber was the procuring cause of the sale, he had no express contract of employment with either Unigard or Mr. Raugust. Mr. Haskell, arguably, had a contract of employment with at least one of Mr. Raugust's entities, but not the seller Cal–Lee, Inc. He did not participate actively in the negotiations, thus we conclude he was not a procuring agent of the sale. Additionally, we do not find sufficient evidence of an implied agreement between Mr. Haskell and Mr. Raugust with respect to the Flour Mill site. Mr. Raugust only equivocally acknowledged a commission due Mr. Haskell on February 11, 1981, when he met with Mr. Roeber.[7] Other than that single reference, there is no evi-

---

[6]Contrary to *Montgomery* is *Wills v. Alcorn,* 636 S.W.2d 142, 145 (Mo. Ct. App. 1982), where the facts indicated broker and seller had been friends for years and that seller inquired about broker's commission rate. Despite no listing agreement, the court awarded broker his commission, dismissing a statute of frauds argument on the grounds it has no application where there has been a complete performance by one of the parties. *Wills,* at 146. *See also Ham v. Morris,* 711 S.W.2d 187 (Mo. 1986).

[7]Mr. Roeber states:

"A Mr. Raugust came into my office, Spokane Industrial Realty, unexpectedly. I didn't know he was coming. He dropped in and wanted to talk to me.

dence Mr. Raugust had impliedly engaged Mr. Haskell as his agent in the sale of the Flour Mill property. The fact Mr. Haskell had procured other sales for Mr. Raugust is not sufficient to imply a contract of employment for the sale of the Flour Mill property. *Coho*, 219 A.2d at 658. In contrast, the meeting between Mr. Raugust and Mr. Roeber on February 11, 1981, suggests Mr. Raugust was not completely happy with Mr. Haskell's efforts.

Although there may have been a moral obligation on the part of Mr. Raugust, we find there was no enforceable express or implied contract of employment between the realtors and Mr. Raugust.

The judgment of the Superior Court is reversed.

GREEN and MUNSON, JJ., concur.

Reconsideration denied January 4, 1988.

Review denied by Supreme Court April 5, 1988.

"Q What did he talk to you about?

"A He talked to me about four different properties he owned. He specifically told me that he wanted me to handle the sale of those properties for him. One of the four was the Flour Mill site.

"Q Were the other three commercial properties?

"A Yes, they were.

"Q What did you reply to him?

"A I told him that I thought Don Haskell was his agent and still had those properties listed. He said to me, 'Don't you worry about Don Haskell. I'll take care of the commission for him. I want somebody that is going to do a more aggressive job of marketing or selling these properties for me. That's why I want you to handle them.'"