[No. 19939-4-II.   Division Two.   December 19, 1997.]

JANET HOLST, *Appellant*, v. FIRESIDE REALTY, INC., ET AL., *Respondents*.

*Duncan A. Bonjorni* of *Bonjorni, Harkness & Zoro*, for appellant.

*Thomas W. Top* of *Lane Powell Spears Lubersky*, for respondents.

MORGAN, J. — The central question in this case is whether a jury could find that a real estate salesperson was acting as agent for both seller and buyer. Holding it could, we reverse the trial court's order granting summary judgment to the defendant.

On August 13, 1983, Janet Holst listed a parcel of land for sale with Fireside Realty, Inc.[1] The listing agreement described the property as 33 acres and stated an asking price of $396,000. The listing agent was Charles Fear, a salesman employed by Fireside.

In September 1983, Lyle Rader drove by the property and noticed Fireside's "For Sale" sign. He then telephoned Fireside and spoke with Arthur Bourgeois, a Fireside broker whom he had previously met.

In early October 1983, Bourgeois showed Rader the property. Rader had questions about a water source, the condition of a barn, and a pile of gravel that was present on the

[1]Janet's husband, Henry, was also an owner of the property. It appears, however, that she and he were going through a divorce, and that she was in control of the property during the times material here. As a result, we refer only to Janet, except when discussing actions specifically taken by Henry.

property. They asked Henry Holst about the water source, and Rader toured the barn to determine its condition. After some research, Bourgeois informed Rader that the gravel belonged to a third party, who was "to get it off the property."[2]

Bourgeois also gave Rader a map of the property. When Rader studied the map, he discovered that the parcel contained approximately 50 acres, rather than the listed 33 acres. He did not disclose this fact to Bourgeois, Fear, or Holst.

Rader orally told Bourgeois he would offer $250,000 for the property. Responding that Holst would probably not accept that price, Bourgeois asked what Rader's highest offer would be. Rader said $300,000, and Bourgeois wrote an offer for that amount.

On or about October 19, 1983, Holst accepted the $300,000 offer and signed an earnest money agreement. The agreement did not state the property's acreage. It did state that the "Listing Agent" was "Chuck Fear by Fireside Realty," and that the "Selling Agent" was "Art Bourgeois by Fireside Realty, Inc."[3]

The earnest money agreement was subject to the corners of the property being staked by a surveyor, to an inspection of the buildings on the premises, and to marketable title. Bourgeois, according to his own testimony, obtained survey bids at Rader's request. He took Rader through the buildings, as a means of satisfying the inspection condition. He also discussed with Rader and the closing agent a problem concerning marketable title.

At a time not certain from the record, Rader asked Bourgeois to obtain bids for removing timber from the property. As Bourgeois later described the request:

> Mr. Rader, in trying to maximize the amount of acreage that he could plant the raspberries, told me that he intended to remove some timber following the closing of the sale, then

[2]Clerk's Papers at 250.

[3]Clerk's Papers at 70.

asked me to get bids on it. I went to a number of loggers and got bids. The file contains survey copies and four bids from various loggers and timber people.[4]

The bids ranged from $10,500 to $22,500, and Bourgeois did not inform Holst they had been obtained.[5]

On December 27, 1983, Holst sued Rader, but not Fireside, Fear or Bourgeois. She alleged that she and Rader had formed an earnest money agreement; that she subsequently had discovered the property had between 47 and 50 acres; and "that she would not proceed under the present Earnest Money Agreement for the stated consideration of Three Hundred Thousand ($300,000.00) Dollars, when such consideration was based upon the purchase of 33 acres."[6] She prayed for a judgment "declaring that said Earnest Money Agreement shall be subject to [ ]rescission or, in the alternative, that performance under it would [be] unconscionable and inequitable and, therefore, that [she] need not further proceed . . . ."[7]

On January 5, 1984, Holst's then-attorney took Fear's deposition. Fear said that during the events above described, Bourgeois was working for Rader.[8]

Apparently because Rader filed some counterclaims not

---

[4]Clerk's Papers at 252.

[5]Ultimately, Rader did not have any of the bidders do the timber removal, but instead used a contractor whom he found through his own efforts.

[6]Clerk's Papers at 142-43.

[7]Clerk's Papers at 143.

[8]Clerk's Papers at 268-71. More specifically, Holst's attorney asked the following questions, and Fear gave the following answers:

Q. As I understand it, Fireside Realty also represented the Raders?

A. Right.

Clerk's Papers at 268.

Q. [W]hen did Fireside Realty have contact with the Raders, apart from the Earnest Money?

A. I wasn't the selling agent. I didn't have the buyer. I was the listing agent, so I don't know when Art started to work with him.

Q. So, Mr. Bourgeois was working with the buyer on this?

shown in the record, Holst decided voluntarily to dismiss her suit and proceed with the sale. The sale actually closed in the latter part of January, 1984.

On February 17, 1984, Holst filed the present action against Fireside, Bourgeois, and Fear. She stated claims for breach of contract, breach of fiduciary duty, and violation of the Consumer Protection Act, RCW 19.86.[9] As a basis for these claims, she alleged that "ARTHUR BOURGEOIS [had] agreed to represent LYLE RADER as a purchaser for the property" before the earnest money agreement had been submitted to her, and that "[t]his information was not made known to JANET HOLST."[10] On March 26, Fireside filed an answer denying that Bourgeois had agreed to represent Rader.

On January 4, 1985, Fireside moved for summary judgment. It argued that *if* it had acted as agent for both Holst and Rader, it had adequately disclosed the dual agency by showing, on the face of the earnest money agreement, that it was acting as both "listing agent" and "selling agent." Holst responded that "[a]t no point in time from my first contact with CHARLES FEAR of FIRESIDE REALTY until the sale . . . did either CHARLES FEAR or ARTHUR BOURGEOIS advise me that FIRESIDE REALTY was

---

A. Right, right.

Clerk's Papers at 269.

Q. You're aware that he was representing them as a buyer, however, in the proceeding?

A. At the time of the Earnest Money, I had no idea who he was working for up until that time.

Clerk's Papers at 270.

Q. All of your contact in this sale, then, was with Mr. Bourgeois?

A. I was representing the Holsts and he was representing the Raders, so . . . .

Clerk's Papers at 271.

[9]Holst additionally alleged negligence and conspiracy, but these claims were not incorporated in the amended complaint filed September 8, 1994.

[10]Clerk's Papers at 2, 106.

representing the purchasers also."[11] The trial court granted Fireside's motion, and Holst appealed.

On February 5, 1987, this court issued an unpublished opinion reversing the trial court's grant of summary judgment and remanding for further proceedings. We ruled that *if* Fireside was acting as a dual agent, "the mere indication on the earnest money agreement that the listing agent and the selling agent both were Fireside Realty was not a full and fair disclosure of the dual representation."[12] Although we did not elaborate then, we note now, as set forth more fully below, that the listing agent is ordinarily the agent of the seller, and that the selling agent is ordinarily the agent or sub-agent of the seller also.[13]

Seven years elapsed. Then, on September 8, 1994, Holst filed an amended complaint that again set forth claims for breach of contract, breach of fiduciary duty, and violation of the Consumer Protection Act. On January 19, 1995, Fireside filed an answer again denying that it had acted as Rader's agent during the sale.

On December 27, 1994, Fireside filed a second motion for summary judgment. This time, it did not argue that if it had been a dual agent, it had adequately disclosed that fact; rather, it argued that it had not been a dual agent in the first instance, because it had never entered into an agency relationship with Rader. It relied on affidavits from Rader and Bourgeois, who stated that Bourgeois had not acted as Rader's agent. Holst relied in part on Fear's deposition from January 5, 1984, in which Fear stated that Bourgeois was working for Rader. Fireside replied to Fear's deposition with a declaration from Fear, dated August 24, 1988, in which Fear stated:

---

[11]Clerk's Papers at 71.

[12]Clerk's Papers at 85.

[13]*Frisell v. Newman*, 71 Wn.2d 520, 528-29, 429 P.2d 864 (1967); *Pilling v. Eastern & Pac. Enters. Trust*, 41 Wn. App. 158, 162, 702 P.2d 1232, *review denied*, 104 Wn.2d 1014 (1985); *First Church of Open Bible v. Cline J. Dunton Realty, Inc.*, 19 Wn. App. 275, 279, 574 P.2d 1211 (1978). In making the statement in the text, we do not consider RCW 18.86, which was enacted long after the events in issue here. It is not applicable to this case.

During the course of my deposition I was asked by [Holst's attorney] if [Bourgeois] was "representing" the purchasers Mr. and Mrs. Lyle Rader. I answered that question affirmatively. In so answering that question, my meaning was not that Mr. Bourgeois was "representing" the purchasers in the legal sense of principal and agent, but only that Mr. Bourgeois had talked and met with the Raders and received their offer to purchase the parcel of land for $300,000. It was not my intent to state or imply that Mr. Bourgeois was representing or acting as agent for Mr. and Mrs. Rader in any legal sense.[14]

On January 19, 1995, Holst filed a cross-motion for summary judgment. She argued, among other things, that this court had ruled in its 1987 unpublished opinion that Fireside was acting as a dual agent, and that the law-of-the-case doctrine precluded the trial court from revisiting that question. She also argued that Fireside was judicially estopped from arguing that it was not acting as a dual agent, because it had said in the 1985-87 proceedings that it was so acting.

■ ■ On August 16, 1995, the trial court granted Fireside's motion and denied Holst's. It then dismissed the case once again, and Holst filed the present appeal. Holst now claims (1) that the trial court erred by granting Fireside's motion for summary judgment, and (2) that the trial court erred by denying her motion for summary judgment. In evaluating these claims, we engage in the same inquiries as the trial court,[15] and we take the facts and all reasonable inferences in the light most favorable to Holst, the nonmoving party.[16] On factual issues, we reverse if rea-

---

[14]Clerk's Papers at 96.

[15]*Barr v. Day*, 124 Wn.2d 318, 324, 879 P.2d 912 (1994).

[16]*Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

sonable people could reach different conclusions,[17] but affirm if reasonable people could reach but one conclusion.[18]

## I. FIRESIDE'S MOTION FOR SUMMARY JUDGMENT

██ ██ It is a "general and basic premise," the Supreme Court has said, "that a real-estate brokerage firm with whom property is appropriately listed for sale becomes the agent of the seller for the purpose of finding a purchaser."[19] Moreover,

> there flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's right and interest or influence his actions.[20]

Insofar as pertinent here, this means that when a real-estate brokerage firm lists property for sale, it owes a duty not to act as the buyer's agent without the seller's consent,

---

[17]*Hansen*, 118 Wn.2d at 485.

[18]CR 56(c).

[19]*Mersky v. Multiple Listing Bureau of Olympia, Inc.*, 73 Wn.2d 225, 228, 437 P.2d 897 (1968); *see also Frisell*, 71 Wn.2d at 525-26; *Ross v. Perelli*, 13 Wn. App. 944, 946, 538 P.2d 834 (1975); *Weinstein v. Sprecher*, 2 Wn. App. 325, 329, 467 P.2d 890 (1970).

[20]*Merksy*, 73 Wn.2d at 229.

and a concomitant duty, if it is considering acting as the buyer's agent, to inform the seller and obtain consent.[21]

Here, it is undisputed that Fireside listed Holst's property. Thus, Fireside was Holst's agent, and it owed Holst the duties stated above.

■■ The dispute concerns whether Fireside breached its duty to Holst. According to Holst, Fireside was acting as a dual agent (i.e., as agent for Rader as well as agent for her), and it failed to disclose its dual agency to her; thus, she says, it breached its duty to her. According to Fireside, it never acted as a dual agent; therefore, it had no duty to disclose, and it committed no breach by not disclosing. Given that we are dealing with motions for summary judgment, the question presented for decision is whether a rational trier of fact could find, according to a preponderance of the evidence, that Fireside and Rader had an agency relationship.

■■ An agency relationship is created by the actions of at least two parties.[22] It may arise by express agreement, or by implication from other conduct.[23] Either way, the principal must manifest a willingness that the agent act on his or her behalf, and the agent must manifest a willingness to act subject to the principal's control.[24] The burden

---

[21]*Cogan v. Kidder, Mathews & Segner, Inc.*, 97 Wn.2d 658, 662-64, 648 P.2d 875 (1982); *Investment Exch. Realty, Inc. v. Hillcrest Bowl, Inc.*, 82 Wn.2d 714, 717-18, 513 P.2d 282 (1973); *Meerdink v. Kreiger*, 15 Wn. App. 540, 544, 550 P.2d 42, *review denied*, 87 Wn.2d 1011 (1976); *Koller v. Belote*, 12 Wn. App. 194, 198-99, 528 P.2d 1000 (1974).

[22]*Costco Wholesale Corp. v. World Wide Licensing Corp.*, 78 Wn. App. 637, 645, 898 P.2d 347 (1995).

[23]*Hewson Constr., Inc. v. Reintree Corp.*, 101 Wn.2d 819, 823, 685 P.2d 1062 (1984); *Kieburtz & Assocs. v. Rehn*, 68 Wn. App. 260, 265, 842 P.2d 985 (1992); *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 607-08, 821 P.2d 63 (1991), *review denied*, 120 Wn.2d 1010 (1992).

[24]*Moss v. Vadman*, 77 Wn.2d 396, 402-03, 463 P.2d 159 (1969); *Matsumura v. Eilert*, 74 Wn.2d 362, 368, 444 P.2d 806 (1968); RESTATEMENT (SECOND) OF AGENCY § 1 (1958). RESTATEMENT (SECOND) OF AGENCY § 15 (1958) provides:

of proving an agency relationship rests on the one asserting it.[25]

■ ■ Transactions involving the sale of real estate often involve both a "listing agent" and a "selling agent." Generally, the listing agent works with the seller and is an agent of the seller, as already discussed above.[26] Generally, the selling agent works with the buyer, but is an agent or subagent of the seller.[27] Particular circumstances, however, can warrant different conclusions. Thus, if either the listing agent or selling agent expressly or impliedly forms an agency relationship with the buyer, he or she will be an agent of the buyer, in addition to or in lieu of being an agent or subagent of the seller.[28]

■ Even though an agency relationship involving the buyer may sometimes be implied, that should not be done merely because the listing or selling agent has contact with the buyer in reasonable and customary ways that the seller should expect, or in ways not inconsistent with the agent's duties, if any, to the seller. The RESTATEMENT (SECOND) OF AGENCY states the general rule that "[u]nless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected

An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.

[25]*Moss*, 77 Wn.2d at 403.

[26]*Frisell*, 71 Wn.2d 527; *Pilling*, 41 Wn. App. at 162; *First Church of Open Bible*, 19 Wn. App. at 279; *Ross*, 13 Wn. App. at 946.

[27]*Frisell*, 71 Wn.2d at 529; *Pilling*, 41 Wn. App. at 162; *First Church of Open Bible*, 19 Wn. App. at 279; *compare Zoda v. Eckert, Inc.*, 36 Wn. App. 292, 297, 674 P.2d 195 (1983), *review denied*, 101 Wn.2d 1006 (1984). *See also* RCW 18.86.010(5), (14); RCW 18.86.020. These sections do not apply here, because they did not take effect until January 1997.

[28]*Cogan*, 97 Wn.2d at 666; *Investment Exch. Realty, Inc.*, 82 Wn.2d 717-18; *Meerdink*, 15 Wn. App. at 543, 543 n.3; *Haskell v. Raugust*, 49 Wn. App. 719, 725, 745 P.2d 535 (1987), *review denied*, 110 Wn.2d 1018 (1988) (quoting *Kohn v. Cohn*, 567 S.W.2d 441, 446-47 (Mo. Ct. App. 1978)); *Koller*, 12 Wn. App. at 195.

with his agency without the principal's knowledge."[29] It then goes on to comment that an agent should be permitted to be in contact with adverse parties according to a custom that is reasonable and known to the seller,[30] or in any other way not inconsistent with the agent's duty to the seller.[31]

In this case, Bourgeois showed Rader the property, provided Rader with a map, answered Rader's questions (in one case after doing additional research), and suggested an initial offer higher than the one Rader had been contemplating. These were reasonable and customary actions, consistent with Holst's interests, and none of them gives rise to an inference that Bourgeois was acting as Holst's agent.

This case differs from most others, however, in that Fear, the listing agent, expressly testified in deposition that Bourgeois was working for Rader. As the listing agent and a member of the same office as Bourgeois, Fear obviously was in a position to observe Bourgeois' conduct with respect to the transaction at issue. Moreover, Fear's testimony is corroborated to some extent by Bourgeois' prior acquaintance with Rader, Bourgeois' obtaining survey bids at Rader's request, Bourgeois' obtaining timber bids at Rader's request, and Bourgeois' not informing Holst about the timber bids. Taking these facts and inferences in the light most favorable to Holst, we think that a rational trier could reasonably infer, if it chose to, that Bourgeois was acting as Rader's agent.

In reaching this result, we do not overlook Fear's declaration, dated August 24, 1988, in which he attempts to explain what he meant at his deposition. He does not dispute that he said Bourgeois was representing Rader. He asserts, however, that meant only that Bourgeois had "talked and met with" Rader, and received Rader's offer to

---

[29]RESTATEMENT (SECOND) OF AGENCY § 391; see Cogan, 97 Wn.2d at 663.

[30]RESTATEMENT (SECOND) OF AGENCY § 391, cmt. a.

[31]RESTATEMENT (SECOND) OF AGENCY § 391, cmt. b.

purchase. It is our view that the declaration and deposition, read together, raise credibility issues that a trier of fact must decide.

Nor do we overlook Fireside's contention that Fear was expressing a legal conclusion for which he had no basis. Although a rational trier could find that he was talking loosely about a relationship he did not understand, it could alternatively find that he was describing conduct he had observed. We conclude that a material issue of fact remains for trial, and that Fireside's motion for summary judgment was improvidently granted.

## II. HOLST'S MOTION FOR SUMMARY JUDGMENT

As already noted, Holst contends not only that the trial court erred by granting Fireside's motion for summary judgment, but also that it erred by denying her motion for summary judgment on liability. If she is right, then she is entitled to judgment on liability, and trial, if any, would be on damages only.

Holst first claims that she is entitled to summary judgment because of the law-of-the-case doctrine. It provides that when an appellate court has determined the applicable law in a first appeal, it generally will not do so again in a second appeal.[32] It does not apply here, however, because we did not determine, in the first appeal, whether Fireside was acting as Rader's agent; rather, we held only that *if* Fireside was acting as Rader's agent, Fireside did not adequately disclose that fact merely by showing in the earnest money agreement that it was both listing and selling agent.

Holst additionally claims that she is entitled to sum-

[32]*State v. Worl*, 129 Wn.2d 416, 424-25, 918 P.2d 905 (1996); *Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988); *Greene v. Rothschild*, 68 Wn.2d 1, 10, 414 P.2d 1013 (1966); RAP 2.5(c)(2). RAP 2.5(c)(2) provides:

*Prior Appellate Court Decision.* The appellate court may at the instance of a party review the propriety of an earlier decision of the appellate court in the same case and, where justice would best be served, decide the case on the basis of the appellate court's opinion of the law at the time of the later review.

mary judgment because of judicial estoppel. Stated in very general terms, that doctrine prevents a party from taking a factual position that is inconsistent with his or her factual position in previous litigation.[33] It does not apply here, however, because Fireside did not previously take an inconsistent position. Before and during the first appeal, it argued that *if* it was acting as Rader's agent, it had adequately disclosed the resulting dual agency. Now, it argues that it was not Rader's agent in the first instance.

In summary, we hold that a rational trier could find that Fireside, through Bourgeois, began representing Rader as Rader's agent. If a rational trier did so find, it could also find that Fireside breached its duty to Holst by not disclosing its dual agency, and require restitution of Fireside's commission.[34] Nothing herein means that Holst is (or is not) entitled to a trial on damages in addition to the commission, for this record shows nothing about whether Fireside's breach, if any, was a legal or factual cause of such damages.[35] Concluding that summary judgment should not have been granted to either party, we reverse and remand for trial.

ARMSTRONG and HUNT, JJ., concur.

---

[33]14 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE: TRIAL PRACTICE, CIVIL, § 382 (5th ed. 1996); *King v. Clodfelter*, 10 Wn. App. 514, 519, 518 P.2d 206 (1974).

[34]*Cogan*, 97 Wn.2d at 667; *Investment Exch. Realty*, 82 Wn.2d at 718; *Meerdink*, 15 Wn. App. at 545; *Koller*, 12 Wn. App. at 196; *see Ramsey v. Sedlar*, 75 Wn.2d 901, 907-08, 454 P.2d 416 (1969).

[35]*Pilling*, 41 Wn. App. at 163-64; *see Cogan*, 97 Wn.2d at 667.