**ANTON FELTON and JUNE FELTON, Plaintiffs**
**v.**
**SCOTT W. ELKINS and TAMMY T. ELKINS, Defendants.**
**SCOTT W. ELKINS, Third Party Plaintiff**
**v.**
**MARTY BEECHLER, and ISLANDIA REAL ESTATE, INC.,**
**Third Party Defendants**

Civil No. 2003-68

District Court of the Virgin Islands

Division of St. Thomas and St. John

January 11, 2007

GREGORY H. HODGES, ESQ., St. Thomas, U.S.V.I., *For the Plaintiffs*.

JOEL H. HOLT, ESQ., St. Croix, U.S.V.I., *For the Defendants/Third Party Plaintiff*.

DENISE M. FRANCOIS, ESQ., St. Thomas, U.S.V.I., *For the Third Party Defendants*.

GOMEZ, *Chief Judge*

## MEMORANDUM OPINION

(January 11, 2007)

Before the Court is the motion of the third party defendants Marty Beechler ("Beechler") and Islandia Real Estate, Inc. ("Islandia") for summary judgment against the third party plaintiff, Scott Elkins ("Elkins"). For the reasons set forth below, the Court will grant the motion.

## I. FACTS

This matter arises from the sale of a condominium where the sellers, Scott Elkins and Tammy Elkins (together, "the Elkins") refused to close the transaction after the buyers, Anton Felton and June Felton (together,

"the Feltons") were seven business days late in making the full down payment.

In 2002, Elkins owned Unit B-1 of the Battery Hill Condominiums in St. John, U.S. Virgin Islands (the "Property"). William Dove ("Dove"), a licensed real estate agent with Tropical Properties, Inc. ("Tropical"), operated the management company for the Battery Hill Condominiums. Pursuant to a Condominium Listing Agreement (the "Listing Agreement") dated November 3, 2002, Dove became the listing agent for the Property. Dove listed the Property on a multiple listing service ("MLS")[1] for the price of $429,000. Thereafter, Beechler, a licensed real estate broker with Islandia, presented Dove with the Feltons' offer to purchase the Property for the full asking price.

Dove faxed the Feltons' offer to Elkins, who made minor changes, including adding a provision that the stamp taxes would be shared equally among the buyer and seller. Elkins also added a clause stating that the "Buyer will cooperate with Seller in any § 1031 Exchange Documentation." Then Elkins signed the contract. Beechler received the contract with Elkins' handwritten changes from Dove on January 6, 2003, and presented it to the Feltons, who initialed the changes.

Pursuant to the contract, the Feltons were required to pay an initial deposit of $1,000 and tender the balance of the 10% down payment, $41,900, by January 27, 2003. The contract also required the Feltons to send written confirmation of the scheduled wire transfer of the balance by January 20, 2003. The contract acknowledged that Dove and Beechler were the real estate agents and Elkins was the principal in this transaction. The last page of the contract stated: READ CAREFULLY BEFORE SIGNING AND CONSULT AN ATTORNEY AND YOUR TAX ADVISOR AS TO THE CONSEQUENCES OF THIS CONTRACT OF SALE.

---

[1]   An MLS has been described as:

a facility by which a MLS member broker makes a blanket unilateral offer of subagency to any other MLS member who can find a buyer to complete the sale. The MLS computer data base contains information about homes listed for sale with its members. MLS members and their home-seeking prospects can review this data via computer terminals or by reviewing printed compilations distributed to members on a bi-weekly basis.

*Re/Max North Cent., Inc. v. Cook,* 272 F.3d 424, 427 n.2 (7th Cir. 2001).

According to this Court's December 29, 2004, opinion:

> On January 20, 2003, the Feltons instructed their U.K. attorney in writing to initiate a wire transfer in the amount of $41,900 to the Tropical Properties account. Mr. Felton then forwarded this letter to Beechler and Dove as notice of the Feltons' timely initiation of the wire transfer. Mr. Felton included a handwritten note on the letter explaining that new U.K. anti-terrorist banking regulations would cause a delay in the remittance of the balance of the deposit money. In addition, on January 20, Mr. Felton sent a letter to [Attorney J. Brion] Morrisette[,] [who represented the Feltons], which was copied to Beechler, again giving notice of the new banking regulations and resulting delay. Mr. Felton also wrote a letter directly to Beechler, enclosing his letter of January 20 to Morrisette. In the letter, Mr. Felton expressed his belief that a slight delay did "not go to the heart of the contract." Neither Elkins, Beechler, nor Dove ever responded to the Feltons much less indicated that this delay would be a problem.

*Felton v. Elkins*, 46 V.I. 422 (D.V.I. 2004) (unpublished). As of January 27, 2003, the Feltons' wire transfer had not been received.

On January 31, 2003, in a conversation with Dove, Elkins expressed an intention to nullify the contract because the balance of the down payment had not been received. Elkins also indicated that if the funds were received quickly, he would rescind his decision to nullify the contract.

> On February 4, the funds had still not been received, and Elkins sent an e-mail to Dove instructing him to return the $1,000 deposit because he believed the contract was void due to the Feltons' failure to make the January 27th payment.

46 V.I. at 424.

On February 4, 2003, Dove received a fax containing a letter from Elkins declaring the contract null and void.[2] That evening, Dove contacted Beechler and informed him of Elkins' letter. Dove also told

---

2    The letter was dated January 30, 2003, but was not received by Dove (via fax) until 4:27 p.m. A.S.T. on February 4, 2003. At 5:13 p.m. A.S.T., Dove received an email containing an attachment consisting of the same letter dated February 4, 2003.

Beechler of his conversation with Scott Elkins on January 31, 2003, wherein Elkins indicated a willingness to wait and see if the wire transfer arrived. Beechler asked Dove to ask Elkins to reconsider his position. Dove agreed. Beechler also asked Dove not to forward the letter he received from Elkins to the Feltons until after Dove spoke with Elkins. Dove agreed to this as well.

> Beechler [thereafter] spoke to Anton Felton on February 5 but told Felton only that Elkins was threatening to call off the deal. Late on February 5, the full deposit amount was received by the Elkins. From February 5 to February 18, Beechler and Felton continued to communicate regarding the closing on the condominium and issues related to the condominium.

*Id.* At no time did Beechler receive any request for a written modification of the contract to address the delay in the wire transfer or any other issue regarding the sale of the Property.

When Elkins received the deposit, Dove sent Beechler information indicating that the wire transfer had arrived. However, Dove did not communicate with Beechler regarding whether Elkins had agreed to rescind his cancellation until February 18, 2003. On that date, Dove informed Beechler that Elkins had cancelled the contract. Additionally:

> Dove instructed Beechler to send a facsimile to the Feltons with an attached letter from the Elkins to Dove dated January 30[, 2003,] and faxed to Dove on February 4[, 2003]. The letter from the Elkins requested Dove to notify 'all parties at once' that the Elkins declared the contract 'null and void' because the balance of the deposit money had not been remitted within twenty-one days as required by the contract.

*Id.* at 425

The record contains no evidence that Elkins ever required strict compliance with the contract's deadlines regarding the deposit as a condition precedent to the sale. During the contract negotiations, Beechler communicated with Elkins only through Dove, and there is no evidence that Dove ever told Beechler that Elkins wished to make time of the essence with respect to the tender of the balance of the deposit. In an affidavit dated September 5, 2006, Beechler stated that he was never instructed to draft the contract so as to be void if the Feltons failed to

supply proof of the wire transfer by January 20, 2003, or if they did not tender the balance of the 10% deposit by January 27, 2003.

In April of 2003, the Feltons filed the underlying four count complaint against the Elkins, including an action for specific performance. In a December 29, 2004, opinion, this Court found that the sales contract "included a 'time is of the essence' clause with respect to the date of closing, but not the date for the payment of the deposit." 46 V.I. at 427 n.1. Accordingly, the Court ruled that the Feltons' delay in tendering the down payment was not a material breach of the real estate contract and that the Feltons were entitled to specific performance. 46 V.I. at 427.

Elkins thereafter filed a third party complaint (the "Complaint") in February of 2004, alleging that Beechler and Islandia breached their fiduciary obligations as agents of Elkins.[3] In Count I, Elkins alleges that Beechler failed to include language in the contract that would have allowed Elkins to nullify the contract if the Feltons did not provide proof of the wire transfer by January 20, 2003 and tender the down payment by January 27, 2003. Count I further alleges that Beechler was acting within the scope of his employment at all relevant times, thus making Islandia liable through the doctrine of respondeat superior.

Count II claims that Beechler (and, vicariously, Islandia) breached a fiduciary duty to act on Elkins' behalf and pursuant to his instructions.[4] The Complaint does not specify what instructions Beechler purportedly refused to obey. However, in his opposition to this summary judgment motion, Elkins claims that Beechler refused to cancel the contract after being instructed to do so by Elkins.

In January, 2006, Elkins filed a motion for partial summary judgment as to his Complaint against Beechler and Islandia. This Court denied

---

[3]     Elkins seeks damages from Beechler and Islandia based on the difference between the selling price of the Property to the Feltons and the current market value of the Property. The third party complaint also sought damages based on Elkins' inability to consummate a section 1031 tax exchange, but he stated in his opposition to Beechler and Islandia's summary judgment motion that he withdraws any claim for damages based on his failure to complete a section 1031 transaction.

[4]     Count II also contains allegations of fraud and deceit. However, at the hearing on the instant motion and in his written opposition, Elkins communicated an intent to withdraw his allegations based in fraud or deceit. Accordingly, the Court will not address these aspects of Count II.

Elkins' motion on April 21, 2006, finding that genuine issues of material fact existed to preclude summary judgment in favor of Elkins.

In their summary judgment motion, Beechler and Islandia argue that they did not breach any fiduciary duties owed to Elkins, because:

1. Neither Elkins nor Dove ever communicated to Beechler in any fashion the terms Elkins wanted Beechler to include in the contract; and

2. Beechler followed all instructions given to him by Elkins' primary agent, Dove (and Elkins never gave any instructions directly to Beechler).

## II. DISCUSSION

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c); *see also Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir. 1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The movant has the initial burden of showing there are no genuine issues of material fact, but once this burden is met it shifts to the non-moving party to establish specific facts showing there is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. In making this determination, this Court draws all reasonable inferences in favor of the non-moving party. *See Board of Educ. v. Earls*, 536 U.S. 822, 850, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002).

## III. ANALYSIS

### A. Breach of Duty in Drafting the Contract

Count I alleges that Beechler and Islandia owed Elkins a duty, as his agents, to draft the contract to accomplish Elkins' intent that it would be void if the Feltons failed to provide proof of the wire transfer and pay the full deposit by the contract dates. Elkins further contends that Beechler

and Islandia violated this duty by not drafting the contract so that time was of the essence with respect to proof of the wire transfer or tender of the full deposit.

■ To successfully make out a claim for an agent's breach of a duty owed to a principal, a plaintiff must show: (1) a duty of care owed to the principal by the agent; (2) a breach of duty by the agent; and (3) an injury to the principal. *See* RESTATEMENT (SECOND) OF AGENCY, § 401 (1958) ("[a]n agent is subject to liability for loss caused to the principal by any breach of duty."); *see also Wilcox v. St. Croix Labor Union Mut. Homes, Inc.*, 567 F. Supp. 924, 937 (D.V.I. 1983) (holding that "[w]hen an agent ... violates any of his fiduciary obligations to his principal he becomes liable to the principal for any losses occasioned by that breach").

Here, the parties do not dispute that Beechler and Islandia were agents of Elkins, and as such, they owed him certain duties of care. However, no Virgin Islands case outlines the standard of care due to a principal from a real estate broker that drafts a contract. Some jurisdictions have held that a broker who drafts a contract is held to the same professional standard as an attorney who drafts a contract on behalf of a client. *See e.g., Wright v. Langdon*, 274 Ark. 258, 623 S.W. 2d 823, 826 (1981) (holding that it is proper to do so "to deter those who might be otherwise tempted to profess a competence they have no right to claim"); *Mattieligh v. Poe*, 57 Wash. 2d 203, 356 P.2d 328 (1960); *Latson v. Eaton*, 1959 OK 124, 341 P.2d 247 (1959). In New Jersey, for example, a real estate broker may draft contracts for the sale of residential property if the contract contains a prominent clause informing the parties of their right to cancel the contract within three days. *N.J. State Bar Ass'n v. Northern N.J. Mortgage Assocs.*, 32 N.J. 430, 161 A.2d 257 (1960).

Even assuming, *arguendo,* that Beechler should be held to the highest standard of care for drafting the contract between the Feltons and the Elkins—that of an attorney—the undisputed facts preclude a finding that Beechler breached this duty of care.

The material facts in an action against an attorney for failing to include a "time is of the essence" clause in a contract are: (1) whether the term was in fact excluded; and (2) whether the attorney had been informed that such a clause was appropriate for the clients' protection. *See Richmond v. Biggans*, 821 F.2d 959, 962 (3d Cir. 1987) (noting that without knowledge that a "time is of the essence" clause is appropriate

713

for a client's protection, there is no reason for an attorney to include one).

■ Here, it is undisputed that the contract did not include a "time is of the essence" clause with respect to the payment of the deposit. Moreover, Beechler was never informed that such a clause was required.[5] As such, he could not have breached a duty to include such language in the contract. It follows that Islandia cannot be held vicariously liable for Beechler's failure to draft the contract to include a provision that time was of the essence regarding payment of the deposit.

Accordingly, the Court will grant the motion of Beechler and Islandia for summary judgment as to Count I.

## B. Breach of Fiduciary Duties by Conduct Subsequent to the Drafting of the Contract

Count II alleges that Beechler and Islandia breached a fiduciary duty owed to Elkins to act pursuant to Elkins' instructions and to act on Elkins' behalf. Each purported breach is addressed below.

### 1. Duty to Obey

In Count II, Elkins alleges that Beechler breached a duty to obey Elkins' instructions to cancel the contract after the Feltons failed to meet the deadlines to provide proof of the wire transfer and to tender the deposit.

■ Section 385(1) of the RESTATEMENT (SECOND) OF AGENCY provides that: "[u]nless otherwise agreed, an agent is subject to a duty to obey all reasonable directions in regard to the manner of performing a service that he has contracted to perform." RESTATEMENT (SECOND) OF AGENCY, § 385(1) (1958). Comment (a) to section 385 explains that the duty applies to reasonable directions given by the *principal. Id.* at *cmt. a*; *see also Walter v. Netherlands Mead N.V.*, 514 F.2d 1130, 1135, 11 V.I.

---

[5] Beechler filed an affidavit, dated September 5, 2006, in which he stated that neither Elkins nor Dove ever instructed him verbally or in writing that the contract had to be drafted so it would be null and void if the Feltons failed to provide proof of the wire transfer by January 20, 2003, or failed to tender the balance of the deposit by January 27, 2003. More specifically, Beechler stated that he did not receive any indication that Elkins wanted to cancel the sale if the deposit was late. In his opposition to this summary judgment motion, Elkins does not dispute any of the statements made by Beechler in his affidavit.

559 (3d Cir. 1975) (finding that the defendant had a duty to follow reasonable directions of a co-worker who was empowered as his principal, despite the fact that they held the same job titles). Furthermore, Black's Law Dictionary defines direction as "[a]n order; an instruction on how to proceed." BLACK'S LAW DICTIONARY (8th ed. 2004). Similarly, Webster's dictionary defines direction as "an explicit instruction, order, command." WEBSTER'S DICTIONARY 640-641 (3d ed. 1993). Accordingly, section 385 requires a principal to give some explicit instruction or order before an agent is obligated to obey it.

As agents of Elkins, Beechler and Islandia were subject to a fiduciary duty to obey all reasonable instructions given by Elkins. *See* RESTATEMENT (SECOND) OF AGENCY, § 385(1); *Walter v. Netherlands Mead N.V.*, 514 F.2d at 1135.

The undisputed facts reveal that Beechler's only communication with Elkins was through Dove. It is also undisputed that Dove communicated two different pieces of information to Beechler on the evening of February 4, 2003. Dove testified at his deposition that,

> I told Marty [Beechler] on the night of the 4th that I had received a letter from Elkins declaring [the contract] null and void, *but that he had also—that Mr. Elkins had also stated that he could rescind the letter if the money were to show up.*

(Dove Dep. 48, Sept. 14, 2005) (emphasis added) That same evening, Beechler informed Felton that Elkins wished to rescind the contract. In response, Felton reiterated to Beechler his desire to consummate the deal. The next day, on February 5, 2003, the full deposit amount was received by Elkins. Accordingly, Beechler did not receive a "reasonable direction" to cancel the contract within the meaning of section 385.[6] *Cf. Grayson v. American Airlines, Inc.*, 803 F.2d 1097, 1102 (10th Cir. 1986) (holding that an employee owed a duty to obey his employer's reasonable direction to accept a temporary assignment in another

---

[6] Beechler received a copy of Elkins' letter at some point, but it is not clear exactly when. However, the letter itself did not contain any explicit instructions to Beechler. The letter merely instructed Dove to communicate to Beechler that Elkins "declare[d] the contract null and void" and directed Dove to "notify the parties" of his desire to terminate the contract. Therefore, even if Beechler had received a copy of Elkins' letter instead of relying on Dove's interpretation of Elkins' instructions, he would not have violated his duty to obey Elkins' instructions.

location when his employer's rules clearly provided for the placement of employees on temporary assignments according to business needs).

Additionally, Elkins' business methods up to that point are also instructive in determining whether he communicated a "reasonable direction" to Beechler. *See* RESTATEMENT (SECOND) OF AGENCY, § 34 ("An [agent's] authorization is interpreted in light of all accompanying circumstances, including ... the business methods of the principal ... [and] the facts of which the agent has notice respecting the objects which the principal desires to accomplish."); *see also Columbia Broadcasting System, Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 375-76 (2d Cir. 1975) ("To determine the extent of an authorization, a court must look to the accompanying circumstances, including ... the business in which they are engaged; the general usages of the business in question and the purported principal's business methods."). As of February 3, 2003, Elkins had not cancelled the contract despite the fact that the Feltons were six days late in paying the deposit in full. Additionally, Dove told Beechler that Elkins stated that he could rescind the cancellation if the deposit arrived shortly thereafter. This demonstrated flexibility in Elkins' business practices, not that he wanted to definitely cancel the contract. Absent an explicit command, Beechler could not have reasonably inferred that Elkins wished to void the contract or to continue to wait for the down payment.

Finally, during their conversation on February 4, 2003, Beechler asked Dove to ask Elkins to reconsider his position. Dove agreed, and told Beechler that he would not forward the cancellation letter to the Feltons until after he asked Elkins to reconsider. Dove did not contact Beechler until February 18, 2003. Considering that Beechler's only contact with Elkins was through Dove, Beechler could not have reasonably inferred Elkins' desire to terminate the contract until February 18, 2003. Thus, Beechler could not have informed the Feltons of Elkins' intent until February 18, 2003. *See* RESTATEMENT (SECOND) OF AGENCY § 33 ("An agent is authorized to do, and to do only, what is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts he knows or should know at the time he acts.").

Therefore, the undisputed facts reveal that Beechler did not receive any explicit instructions to cancel the contract, nor could he have reasonably inferred that Elkins desired for him to do so. Accordingly, the

Court will grant the summary judgment motion of Beechler and Islandia with respect to Count II to the extent it relates to the alleged breach of the duty to obey.

## 2. Duty of Loyalty

In Count II, Elkins also alleges that Beechler breached his duty of loyalty to Elkins by actively encouraging the Feltons to sue the Elkins instead of acting on Elkins' behalf.

Section 387 of the RESTATEMENT (SECOND) OF AGENCY provides that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." RESTATEMENT (SECOND) OF AGENCY § 387 (1958). Furthermore, section 391 of the Restatement states that:

> Unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge.

RESTATEMENT (SECOND) OF AGENCY § 391 (1958); *See also Frey*, 29 F.3d at 1156 (noting that, pursuant to a broker's duty of loyalty, he may not act as agent for both the seller and the purchaser in the same transaction unless both parties consent to such dual representation); *Randal Craft Realty Co., Inc.*, 653 F.2d at 1069 (explaining that a real estate agent "must not put himself in a position antagonistic to the principal's interest by ... action adverse to his client's interests ... or in any of several other ways").

The parties do not dispute that Beechler and Islandia owed Elkins a duty of loyalty as a result of their agency relationship with Elkins. Indeed,

> there flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal. ...

*Holst v. Fireside Realty, Inc.*, 89 Wash. App. 245, 948 P.2d 858, 862-63 (1997). Though Beechler and Islandia concede that they owed Elkins a duty of loyalty, they claim they are entitled to summary judgment because Elkins cannot point to any evidence to show that Beechler ever failed to act on Elkins' behalf.

As evidence of this alleged disloyalty, Elkins points to a letter Beechler wrote to Attorney J. Brion Morrisette ("Morrisette"), counsel for the Feltons, on February 18, 2003, in which he discussed his view of the events that occurred between February 4, 2003, and February 18, 2003. In that correspondence, Beechler mentioned Elkins' letter of cancellation. He also told Morrisette that Elkins had verbally rescinded the cancellation letter when he received assurance that the wire transfer of the balance of the deposit would arrive shortly. Beechler also indicated that Elkins had, by February 18, 2003, taken the position that the letter had not been formally rescinded and that the deal was off. Finally, Beechler told Morrisette that "Elkins [was] playing some sort of game. ..."

In addition to the February 18, 2003, letter from Beechler to Morrisette, Elkins points a declaration submitted by Felton. In the declaration, Felton stated that between February 18, 2003, and February 25, 2003, Beechler indicated that he did not believe the cancellation was legally binding and suggested that Felton consult with Morrisette.

These facts, however, do not suggest that Beechler failed to act solely for the benefit of Elkins, and certainly do not constitute active encouragement of the Feltons to sue the Elkins. Moreover, it is undisputed that Dove had previously told Beechler that Elkins had indicated a desire to rescind the cancellation if the deposit arrived shortly. Promptly thereafter, Elkins received the deposit. Upon Elkins' receipt of the deposit, Dove sent Beechler information showing that the wire transfer had arrived and said nothing about the contract being cancelled. It was not until several days later that Dove told Beechler that Elkins had refused to rescind the cancellation. Accordingly, the undisputed facts reveal that Beechler was merely expressing his interpretation of the events in light of the information communicated to him through Dove.

Elkins has presented no evidence that Beechler put his own interests or the interests of the Feltons above the interests of Elkins. Indeed the undisputed facts do not support the allegation that Beechler breached his duty of loyalty owed to Elkins. *Cf. Miller v. C.C. Meisel*

718

*Co., Inc.*, 183 Ore. App. 148, 51 P.3d 650, 662 (2002) (holding that an employee did not breach his duty of loyalty to his employer by making unauthorized bonuses to other employees, since there was no evidence that he had engaged in self-dealing by acting for his own benefit rather than for the benefit of his employer); RESTATEMENT (SECOND) OF AGENCY § 391 cmt. b (stating that the receipt of anything substantial from an adverse party, or the promise of an indirect reward by the other party is sufficient evidence of a breach of the duty of loyalty).

Accordingly, the Court will grant the motion of Beechler and Islandia for summary judgment with respect to Count II as it relates to the alleged breach of the duty of loyalty.

## III. CONCLUSION

Because there are no material facts in dispute and Beechler and Islandia are entitled to judgment as a matter of law, the Court will grant the motion for summary judgment. An appropriate judgment follows.